IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

# CASE NUMBER 25-10855

---

UNITED STATES OF AMERICA,
*PLAINTIFF-APPELLEE.*,

V.

CHARLES LENARD BROWNLEE,
*DEFENDANT-APPELLANT.*

---

ON DIRECT APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

---

## APPELLANT'S INITIAL BRIEF

JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER

J. MATTHEW WRIGHT
ASSISTANT FEDERAL PUBLIC DEFENDER
600 South Tyler Street
Suite 2300
Amarillo, Texas 79101
(806) 324-2370
Matthew_Wright@fd.org

Counsel for Appellant

## Certificate of Interested Persons
## ***United States v. Charles Lenard Brownlee*, Case No. 25-10855**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellant: | Charles Lenard Brownlee |
| Defense Counsel: | Federal Public Defender for the Northern District of Texas<br>J. Matthew Wright<br>John M. Nicholson<br>Devon Judy Sanders |
| Prosecutors: | U.S. Attorney for the Northern District of Texas<br>Gail A. Hayworth<br>Eric B. Chen<br>Michael Levi Thomas |
| District Judges: | Hon. Reed O'Connor<br>Hon. Terry R. Means |
| Magistrate Judges: | Hon. Jeffrey L. Cureton |

*/s/ J. Matthew Wright*
Counsel for Appellant

## Statement Regarding Oral Argument

Appellant requests oral argument. This Court has never addressed whether police perform a "search" under the Fourth Amendment when they utilize a vast locational surveillance database to identify a specific vehicle, reconstruct its historical movements, and find its current location. That's exactly what officers did in the case below. The results of their unwarranted searches led police directly to the evidence used to convict Mr. Brownlee below.

## Table of Contents

Certificate of Interested Persons .......... ii

Statement Regarding Oral Argument .......... iii

Table of Authorities .......... vii

Jurisdictional Statement .......... 1

Issues Presented for Review .......... 2

Statement of the Case .......... 4

1. Law enforcement utilized a pervasive system of electronic surveillance to identify, locate, arrest, and convict Mr. Brownlee .......... 6

   1.1. Through its interconnected cameras, cloud storage, and artificial intelligence platform, Flock Safety has created an unavoidable curtain of vehicle surveillance in cities across America. .......... 7

   1.2. By using the Flock database, police in the DFW Metroplex are able to reconstruct someone's "pattern of life." .......... 10

   1.3. Mr. Brownlee's identification, arrest, and much of the evidence used to convict him were the direct results of unwarranted searches of the Flock database. .......... 13

   1.4. After the district court denied Mr. Brownlee's motion to suppress the fruits of the Flock searches, the Government relied on that evidence to prove his guilt .......... 16

2. The district court denied Mr. Brownlee's motion to dismiss the five firearm charges under 18 U.S.C. § 924(c) because it believed that Hobbs Act robbery and attempted robbery are divisible offenses. .......... 19

Summary of the Argument .......... 20

Argument .......... 21

I. The district court should have granted Mr. Brownlee's motion to suppress the fruits of the Flock searches. .... 21

A. Appellate review is plenary and de novo. .... 22

B. Police performed a "search" (or multiple searches) under the Fourth Amendment when they collected and utilized the Flock database. .... 23

1. Police perform a "search" when they violate a person's reasonable expectation of privacy. .... 24

2. Americans enjoy a reasonable expectation of privacy in "the whole of their physical movements." .... 27

3. Police violate reasonable expectations of privacy when they use Flock's permeating locational surveillance to reconstruct citizens' current and historical movements. .... 30

4. A private company collects and maintains the surveillance database, but that does not eliminate Fourth Amendment protection. .... 35

5. Flock's nationwide surveillance dragnet is dissimilar in kind and degree from traditional surveillance by physical observation. .... 36

C. The Fourth Amendment requires a particularized warrant supported by probable cause. .... 39

1. Police used the Flock database without any judicial oversight. .... 39

2. The Flock locational surveillance database presents new and troubling opportunities for abuse. .... 40

D. Mr. Brownlee has standing to challenge the unwarranted Flock searches. .... 45

1. The occupants of an automobile have a reasonable expectation of privacy in the whole of its movements. .... 46

2. Everyone agreed that Mr. Brownlee occupied the Hyundai Santa Fe during the times that the police were tracking it and reconstructing its movements. .... 46

3. Alternatively, as a bailee with his sister's permission to possess and use her Hyundai Santa Fe, Mr. Brownlee had a possessory right superior to all others. .... 47

II. Properly understood, the Hobbs Act violations charged in Counts Two, Three, Four, Five, and Six were not "crimes of violence" for purposes of 18 U.S.C. § 924(c). .... 49

A. The standard of review is *de novo*. .... 49

B. The Hobbs Act indisputably criminalizes conduct outside § 924(c)'s definition of "crime of violence." .... 49

C. Attempted and completed Hobbs Act robbery are indivisible alternatives .... 52

1. Unanimity is the most important factor for analyzing divisibility. .... 53

2. Jurors can unanimously convict a defendant under § 1951(a) while disagreeing about completion. .... 55

3. By specifying a single punishment in a single subsection, Congress suggested indivisibility. .... 58

D. Mr. Brownlee wishes to preserve, for further review, the argument that even completed Hobbs Act robbery can be committed without the use, attempted use, or threatened use of physical force against the person or property of another. .... 59

Conclusion .... 60

Certificate of Service .... 61

Certificate of Compliance .... 62

# Table of Authorities

## Cases

*Andersen v. United States*, 170 U.S. 481 (1898)........................................................ 54

*Byrd v. United States*, 584 U.S. 395 (2018) ............................................................... 46

*Carpenter v. United States*, 585 U.S. 296 (2018) ................................................ *passim*

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ...................................................... 45

*Floyd v. State*, 714 S.W.3d 9 (Tex. Crim. App. 2024), *reh'g denied* (Jan. 22, 2025)................................................................................................... 55

*Gomez-Perez v. Lynch*, 829 F.3d 323 (5th Cir. 2016).................................................. 54

*Katz v. United States*, 389 U.S. 347, 361 (1967)......................................................... 26

*Landrian v. State*, 268 S.W.3d 532 (Tex. Crim. App. 2008) ...................................... 54

*Mathis v. United States*, 579 U.S. 500 (2016)................................................52, 53, 58

*New York v. Class*, 475 U.S. 106 (1986) ............................................................ 36, 37

*Olabisiomotosho v. City of Houston*, 185 F.3d 521 (1999) ...................................... 36, 37

*Petteway v. Galveston Cnty.*, 111 F.4th 596, 608 (5th Cir. 2024)................................ 57

*Rakas v. Illinois*, 439 U.S. 128 (1978)......................................................................... 45

*Schad v. Arizona*, 501 U.S. 624 (1991) ................................................................ 53, 54

*Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003)...................................... 59

*Schmidt v. City of Norfolk*, No. 2:24-cv-621, 2025 WL 410080 (E.D. Va. Feb. 5, 2025)............................................................................................... 38

*State v. De La Rosa*, No. DC-F202500899 (Johnson Cnty., Tex. Dist. Ct. filed Oct. 1, 2025)............................................................................................ 43

*Stirone v. United States*, 361 U.S. 212 (1960) ............ 56

*United States v. Avalos-Sanchez*, 975 F.3d 436 (5th Cir. 2020) ............ 56

*United States v. Bowens*, 907 F.3d 347 (5th Cir. 2018) ............ 49

*United States v. Cuevas-Perez*, 640 F.3d 272 (7th Cir. 2011) ............ 44

*United States v. D'Amico*, 496 F.3d 95 (1st Cir. 2007), *vacated on other grounds*, 552 U.S. 1173 (2008) ............ 55

*United States v. Davis*, 588 U.S. 445, 448 (2019) ............ 49, 50, 52

*United States v. Davis*, 903 F.3d 483, 485 (5th Cir. 2018) ............ 52

*United States* v. *Di Re,* 332 U.S. 581 (1948) ............ 25

*United States v. Ellison*, 462 F.3d 557 (6th Cir. 2006) ............ 36, 37

*United States v. Garrett*, 24 F.4th 485 (5th Cir. 2022) ............ 55

*United States v. Gomez Gomez*, 23 F.4th 575 (5th Cir. 2022) ............ 54

*United States v. Hernandez*, 647 F.3d 216 (5th Cir. 2011) ............ 46

*United States v. Herrold*, 883 F.3d 517 (5th Cir. 2018) (en banc), *vacated on other grounds*, 587 U.S. 1060 (2019), *reinstated in relevant part*, 941 F.3d 173 (5th Cir. 2019) (en banc) ............ 53

*United States v. Hill*, 63 F.4th 335 (5th Cir. 2023) ............ 57

*United States v. Jones*, 565 U.S. 400 (2012) ............ *passim*

*United States v. Knotts*, 460 U.S. 276 (1983) ............ *passim*

*United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir.1990) ............ 23

*United States v. Lott*, 64 F.4th 280 (5th Cir. 2023) ............ 56

*United States v. Madrid-Paz*, No. 22-20397, 2023 WL 7013354 (5th Cir. Oct. 24, 2023) .......... 57

*United States v. Perez*, 484 F.3d 735 (5th Cir. 2007) .......... 22

*United States v. Ramamoorthy*, 949 F.3d 955 (6th Cir. 2020) .......... 55

*United States v. Riazco*, 91 F.3d 752 (5th Cir. 1996) .......... 23

*United States v. Robinson*, 119 F.3d 1205 (5th Cir. 1997) .......... 56

*United States v. Robinson*, 67 F.4th 742 (5th Cir. 2023) .......... 56

*United States v. Rose*, 127 F.4th 619 (5th Cir. 2025) .......... 55

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) .......... *passim*

*United States v. Stoglin*, 34 F.4th 415 (5th Cir. 2022) .......... 54

*United States v. Taylor*, 596 U.S. 845 (2022) .......... 51, 52

*United States v. Turner*, 839 F.3d 429 (5th Cir. 2016) .......... 25

*United States v. York*, 578 F.2d 1036 (5th Cir. 1978) .......... 55, 58

*Webster v. Fall*, 266 U.S. 507, 511 (1925) .......... 57

**Constitutional Provisions**

U.S. Const., amend. IV .......... *passim*

**Statutes**

18 U.S.C. § 1951(a) .......... *passim*

18 U.S.C. § 1951(b)(1) .......... 59

18 U.S.C. § 2703(d) .......... 40

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3742 .......... 1

18 U.S.C. § 922(g)(1) .......... 5

18 U.S.C. § 924(c) .......... *passim*

18 U.S.C. § 924(c)(1)(A)(ii) .......... 2, 20, 50

18 U.S.C. § 924(c)(1)(D) .......... 50

18 U.S.C. § 924(c)(3)(A) .......... 3, 51, 59

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 2255(h)(2) .......... 56

**Rules**

Fed. R. App. P. 4(b)(1)(A) .......... 1

Fed. R. Crim. P. 51(b) .......... 23

**Other Authorities**

Brian Kerhin, *Menasha police officer accused of using license plate recognition system to track his ex*, Fox 11 News (Jan. 9, 2026), https://perma.cc/C9DQ-SRSR .......... 42

Cameron Probert, *Eastern WA Flock cameras were searched after false abortion claim*, Tri-City Herald (Feb. 5, 2026), https://perma.cc/W6EL-C4ZD .......... 42

Cody Thorn, *Colleyville to add 11 new license plate readers in 8 different locations*, Community Impact (April 2, 2024), https://perma.cc/X46W-VW8G .......... 12

Emily Brindley, *After abortion report, North Texas cop used surveillance network to look for woman*, Dallas Morning News (June 13, 2025), online at https://perma.cc/Z6DZ-RC6U .......... 43

Hailey Tucker, *FF12: Kechi officer stalking incident prompts concerns about WPD 'FLOCK' technology*, KWCH 12 News (Oct. 31, 2022), https://perma.cc/4TTB-Y43V ........................................................ 42

Jeremy Bentham, *Panopticon; or, the Inspection House* (1791)........................................ 43

Jordan Elder, *Tracked across state lines: Texas sheriff's use of license plate data raises alarms*, News 4 San Antonio (June 17, 2025), https://perma.cc/4PTT-LAEB ........................................................ 43

Keenan Willard, *Arlington PD re-ups with Flock license plate cameras, residents worry about privacy*, NBCDFW (Oct. 16, 2024), https://perma.cc/SM6U-M93N........................................................ 12

Michael Stavola, *Kansas police chief used Flock license plate cameras 164 times to track ex-girlfriend*, Wichita Eagle (Aug. 17, 2024), https://perma.cc/YPW4-U38Q ........................................................ 42

*NEW DETAILS: Former Braselton Police Chief accused of stalking; judge denied protective order*, WSB-TV 2 (Nov. 24, 2025), https://perma.cc/67MK-99YV........................................................ 42

Olivia Lloyd, *Cop stalks girlfriend, runs her license plate 70 times in 7 months, Florida cops say*, Miami Herald (Feb. 7, 2025), https://perma.cc/CV9S-M8NW........................................................ 42

Press Release, Tex. Motor Vehicle Crime Prevention Authority, Texas Communities Combat Motor Vehicle Crime (June 9, 2022), https://perma.cc/72JH-BM8V........................................................ 12

Sarah Motter, *Joplin officer no longer employed after alleged misuse of license plate tracking system*, KCTV 5 (Jan. 12, 2026), https://perma.cc/Z7SV-XYH9 ........................................................ 42

The Federalist No. 51 (J. Cooke ed. (1961))........................................................ 41

Thomas Brewster, *AI Startup Flock Thinks It Can Eliminate All Crime In America*, Forbes (Sept. 3, 2025), https://perma.cc/N47D-LSWD........................... 7

Thomas Gruel, *North Charleston Police officer demoted for using cameras to track wife*, WCSC (June 24, 2024), https://perma.cc/7K33-HFG4 ........................ 42

U.S. Census Bureau, *Quick Facts: Colleyville city, Texas*, https://www.census.gov/quickfacts/fact/table/colleyvillecitytexas/LND110220 ........................ 12

U.S. Census Bureau, *Quick Facts: Euless city, Texas*, https://www.census.gov/quickfacts/fact/table/eulesscitytexas/LND110220 ........................ 12

U.S. Census Bureau, *QuickFacts: Arlington city, Texas*, https://www.census.gov/quickfacts/fact/table/arlingtoncitytexas/LND110220 ........................ 12

U.S. Census Bureau, *QuickFacts: Grapevine city, Texas*, online at https://www.census.gov/quickfacts/fact/table/grapevinecitytexas/LND110220 ........................ 12

VEHICLE FINGERPRINT, Registration No. 5849820 ........................ 9

W. Michael Cox & Richard Alm, *Rethinking Dallas's Attraction to the Automobile*, D Magazine (Sept. 6, 2018), https://www.dmagazine.com/publications/d-ceo/2018/september/rethinking-dallas-attraction-to-the-automobile/ ............ 10, 34

## Jurisdictional Statement

The district court had original jurisdiction over this criminal prosecution pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered judgment against Mr. Brownlee on July 18, 2025. ROA.597. Mr. Brownlee filed a timely notice of appeal on July 23. ROA.603; *see* Fed. R. App. P. 4(b)(1)(A).

## Issues Presented for Review

I.

Companies like Flock Safety have constructed a permeating nationwide curtain of AI-powered surveillance cameras. The system provides police with instant, unmediated access to the current and historical locations of millions of automobiles throughout the United States.

A.

The district court ruled that the police's use of this pervasive and unavoidable surveillance infrastructure was not a "search" for purposes of the Fourth Amendment. Was that wrong?

B.

The district court ruled that a targeted occupant of an automobile who had the owner's permission to use that automobile lacked standing to object to the police's use of the pervasive surveillance technology to track the vehicle's present and historical locations. Was that wrong?

II.

Mr. Brownlee's five convictions for brandishing a firearm during a "crime of violence" added 35 years to his sentence. *See* 18 U.S.C. § 924(c)(1)(A)(ii). All five brandishing convictions presume that the underlying "predicate" offense—interference

with commerce under 18 U.S.C. § 1951(a)—is categorically a "crime of violence" under 18 U.S.C. § 924(c)(3)(A).

A.

Are "attempted robbery" and "completed robbery" distinct and divisible offenses under 18 U.S.C. § 1951(a)?

B.

When the Hobbs Act predicates are properly narrowed to a single divisible offense, does that offense categorically satisfy the "crime of violence" definition in § 924(c)(3)(A)?

## Statement of the Case

A jury convicted Appellant Charles Lenard Brownlee of twelve federal felonies arising from a series of five armed robberies. ROA.581-584; ROA.597-602. Those robberies were committed over a twelve-day span at five different branch locations of the Cash Store, a check-cashing and payday lending business, in five different cities within the DFW metroplex:

| Second Superseding Indictment Counts | Date | The Cash Store Branch Location |
|---|---|---|
| Two,[1] Seven[2] | May 9, 2024 | Grand Prairie, Texas |
| Three,[3] Eight[4] | May 13, 2024 | Fort Worth, Texas |
| Four,[5] Nine[6] | May 18, 2024 | Euless, Texas |
| Five,[7] Ten[8] | May 21, 2024 | Hurst, Texas |
| Six,[9] Eleven[10] | May 21, 2024 | Grapevine, Texas |

[1] ROA.311

[2] ROA.316

[3] ROA.312

[4] ROA.317

[5] ROA.313

[6] ROA.318

[7] ROA.314

[8] ROA.319

[9] ROA.315

[10] ROA.320

Count One of the Second Superseding Indictment charged Conspiracy under the Hobbs Act, 18 U.S.C. § 1951(a). ROA.309-311. Counts Two through Six charged Interference with Commerce by Robbery under the same statute. ROA.311-315. Counts Seven through Eleven charged Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c). ROA.316-320. Each § 924(c) count was predicated on a separate robbery. Count Twelve charged Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). ROA.321. The district court sentenced Mr. Brownlee to an aggregate term of sixty years in prison. ROA.599.

Before trial, Mr. Brownlee filed two motions that are pertinent to this appeal. The first sought suppression of evidence obtained by the police's use of a pervasive electronic surveillance system installed and maintained by a company called Flock Safety. ROA.129-141. The second relevant pretrial motion sought dismissal of the five counts under 18 U.S.C. § 924(c). ROA.121-128; ROA.334-335. Together, those counts required thirty-five consecutive years in prison. The district court denied both motions. *See* ROA.413-423 (denying motion to suppress); ROA.299-300 (denying motion to dismiss § 924(c) counts in First Superseding Indictment); ROA.338 (applying the same reasoning to deny the § 924(c) counts in the Second Superseding Indictment).

The court entered its written judgment of conviction and sentence on July 18, 2025. ROA.597. This timely appeal followed five days later. ROA.603.

### 1. Law enforcement utilized a pervasive system of electronic surveillance to identify, locate, arrest, and convict Mr. Brownlee.

On the morning of May 21, and through mid-day, police were investigating three potentially related Cash Store robberies but had very little to go on. By the end of that day, they had arrested Mr. Brownlee, identified a co-conspirator, and seized a mountain of damning evidence. To make the jump from near total ignorance to overwhelming evidence of guilt, police used a massive surveillance database collected and maintained by a company called Flock Safety.

As this case illustrates, Flock's database constantly collects information about Americans' locations and movements from thousands of surveillance cameras strategically placed throughout the nation. Flock's powerful computers upload the images, analyze them, and collect detailed metadata including precise location, timestamp, and specific identifying characteristics for every passing automobile. Flock maintains the photographs and data for at least thirty days and makes the entire database available to cooperating police departments in easily searchable form. ROA.261. With the push of a few buttons, an officer with access to Flock's database can identify the current location and can reconstruct the travel history of nearly every automobile in numerous American cities. And under the ruling below, officers are free to utilize that massive database of location data as they see fit, without ever consulting a magistrate and without probable cause.

### 1.1. Through its interconnected cameras, cloud storage, and artificial intelligence platform, Flock Safety has created an unavoidable curtain of vehicle surveillance in cities across America.

Flock Safety is a multi-billion-dollar company that "has quietly built a network of more than 80,000 cameras pointed at highways, thoroughfares and parking lots across the U.S." Thomas Brewster, *AI Startup Flock Thinks It Can Eliminate All Crime In America*, Forbes (Sept. 3, 2025), https://perma.cc/N47D-LSWD. Flock's powerful digital cameras are strategically mounted atop poles next to busy thoroughfares or intersections. The Government provided annotated photographs of two such cameras in response to Mr. Brownlee's motion to suppress:






*See* ROA.280, 281.

Flock cameras are sometimes described as "Automatic License Plate Readers" or "ALPRs"—but that severely understates both the volume and the utility of the electronic data the system collects and maintains. The camera "takes pictures as each vehicle passes by." ROA.1098. The photos are high resolution: Government Exhibit 44 (ROA.1773) was a full-page print of one Flock photograph, and the photo remains clear even after it was printed and then re-scanned for purposes of the EROA.

The system does more than simply photograph the cars that pass by. "All the photographs go into a database," and Flock's system "analyze[s] the photographs" to identify *specific* vehicles using their physical features. ROA.1082. The system captures

the license plate number, but it also extracts additional information. Flock's marketing materials brag about the system's ability to "fingerprint" individual automobiles based on their physical appearance without seeing the VIN and regardless of any license plate. The company even registered the trademark, VEHICLE FINGERPRINT, Registration No. 5849820, to promote this advanced technology.

In other words, the Flock cameras do not merely read or record a "license plate" or plate number. Instead, every time a vehicle passes a Flock camera, the system captures a high-resolution photograph and a treasure trove of metadata, including an exact timestamp, an exact location, and a list of physical characteristics specific enough to distinguish among otherwise identical examples of the same year, make, model, and color of car. Each of these so-called "Flock hits"[11] is indexed, stored for up to 30 days, and easily searchable by any police officer with access to the system.

Because Flock's systems capture photographs and analyze data indiscriminately, police can and often do use the database retrospectively. By searching all the "Flock hits" over the last month, police can re-construct a person's movements, even where those movements preceded any suspected wrongdoing or any official suspicion.

[11] ROA.1119

### 1.2. By using the Flock database, police in the DFW Metroplex are able to reconstruct someone's "pattern of life."

The Dallas-Fort Worth Metroplex is a sprawling collection of over 200 cities and towns. "[Q]uite a few" of those cities have entered into surveillance contracts with Flock Safety. ROA.1082.

Though the region is densely populated, it tends to grow *out* rather than *up*. In that kind of world, access to an automobile "is more necessity than convenience":

> According to American Community Survey data, residents of the 13-county region owned more than 4.5 million passenger vehicles in 2016. That equates to 1.85 vehicles per household, second only to Riverside, California, among the 15 largest metropolitan statistical areas (MSAs).
>
> Two-thirds of DFW households owned more than one car. Less than 5 percent of DFW households were without any car—the lowest rate among the biggest metropolitan areas.

W. Michael Cox & Richard Alm, *Rethinking Dallas's Attraction to the Automobile*, D Magazine (Sept. 6, 2018), https://www.dmagazine.com/publications/d-ceo/2018/september/rethinking-dallas-attraction-to-the-automobile/.

The current record does not disclose *just how many* Flock cameras have been installed in North Texas. Mr. Brownlee requested an evidentiary hearing to develop that evidence, but the district court decided that all relevant facts were undisputed. ROA.419-420.

Even so, the pleadings, trial testimony, and public records show that the Flock surveillance network is *pervasive*. Officers from Euless and Grapevine Police Departments used the Flock database on May 21 to find all black Hyundai or Kia sport utility vehicles that had passed near one robbery's location, then reconstructed the historical movements of one or more of those SUVs, identified a specific SUV, and then tracked its current location.

Flock Safety encourages cities to share their surveillance data with the entire Flock network. Thus, an officer in a city like Euless could search for and find current and historical Flock hits in other cities like Colleyville,[12] Grapevine,[13] and Arlington.[14] Those cities do not install Flock cameras at every intersection, ROA.1101, but they strategically place enough cameras to reveal who moves into, out of, and within the city, and when. The table below gives a sense for how many cameras are at work in those four cities and, for lack of a better term, the surveillance curtain's density:

[12] ROA.1084; ROA.1772-1773

[13] ROA.1084-1085

[14] ROA.1118-1120

| City | Flock Cameras | Area (in square miles) |
|---|---|---|
| Arlington | "more than 130"[15] | 95.87[16] |
| Colleyville | 11 (in 8 locations)[17] | 13.12[18] |
| Euless | 33[19] | 16.12[20] |
| Grapevine | 9[21] | 32.14[22] |

In the trial, Grapevine Police Detective Phillip Wolan candidly admitted the power of this surveillance system:

> The best way to describe it, Flock license plate scans usually give you pattern of life. You're usually going to see license plate scans of people going to work, coming from work, like the major roads they're going to take.

ROA.1120.

[15] Keenan Willard, *Arlington PD re-ups with Flock license plate cameras, residents worry about privacy*, NBCDFW (Oct. 16, 2024), https://perma.cc/SM6U-M93N

[16] U.S. Census Bureau, *QuickFacts: Arlington city, Texas*, https://www.census.gov/quickfacts/fact/table/arlingtoncitytexas/LND110220

[17] *See* Cody Thorn, *Colleyville to add 11 new license plate readers in 8 different locations*, Community Impact (April 2, 2024), https://perma.cc/X46W-VW8G

[18] U.S. Census Bureau, *Quick Facts: Colleyville city, Texas*, https://www.census.gov/quickfacts/fact/table/colleyvillecitytexas/LND110220

[19] ROA.1080

[20] U.S. Census Bureau, *Quick Facts: Euless city, Texas*, https://www.census.gov/quickfacts/fact/table/eulesscitytexas/LND110220

[21] *See* Press Release, Tex. Motor Vehicle Crime Prevention Authority, Texas Communities Combat Motor Vehicle Crime (June 9, 2022), https://perma.cc/72JH-BM8V

[22] U.S. Census Bureau, *QuickFacts: Grapevine city, Texas*, online at https://www.census.gov/quickfacts/fact/table/grapevinecitytexas/LND110220

Wolan also testified about an additional database of vehicle photographs and location data called "Vigilant." ROA.1119. Vigilant's cameras also capture and save images and of automobiles and their license plates while storing metadata like timestamp and location. Vigilant cameras are typically mounted on other automobiles like police cars or tow trucks. ROA.1119. Vigilant's database is more likely to reveal where someone lives. ROA.1120.

### 1.3. Mr. Brownlee's identification, arrest, and much of the evidence used to convict him were the direct results of unwarranted searches of the Flock database.

The investigation of the five Cash Store robberies came to a head on the afternoon of May 21, 2024. Two detectives from the Euless Police Department were investigating the May 18 robbery in their city when they heard about the May 21 robberies in Hurst and Grapevine. ROA.144-145; ROA.1078. When the day began, they had only minimal information about the perpetrator, and none of that information could be used to identify or find him.

Believing that the robberies were all connected, the detectives focused on the getaway vehicle. Before the Flock searches, Euless detectives did not have the vehicle's license plate number.[23] Based on a witness statement and a nearby restaurant's surveillance footage, the detectives believed that the robber was using a black SUV made by

[23] At trial, Grand Prairie Police Detective Jeremy Massey testified that he collected surveillance footage from businesses near that city's Cash Store after the May 9 robbery. ROA.790-93. One of

Hyundai or Kia. ROA.144. One witness reported "that the suspect vehicle had a blue fuzzy steering wheel cover." ROA.144.

Detective David Norvell performed a "blind search" of the Flock database for images of "black Hyundai or Kia SUVs" captured near time and location of the Grapevine Cash Store robbery. ROA.145; ROA.262. He later averred that his search led him to focus on "approximately 11 images." ROA.262.

Norvell then searched Flock's database for other "hits" on those eleven vehicles. He found that one of them—a black Hyundai Santa Fe, bearing license plate TRK-3126—was *also* photographed near the Euless robbery on May 18. ROA.152. The Euless detective shared this information with Grapevine Police Detective Phillip Wolan. ROA.152. Using the Flock and Vigilant databases, Wolan learned that the Hyundai had been scanned numerous times while parked in front of a residential address on Lake Front Trail in Arlington. The Santa Fe was registered at that same address. ROA.152.

Wolan then used the Flock database to find the *current* location of the black Hyundai. He began continually refreshing the Flock database to get "updated hits."

---

those videos showed the same Hyundai Santa Fe and its license plate (TRK-3126). ROA.804. Euless detectives did not have access to that information on May 21. *See* ROA.144. They knew that Fort Worth and Grand Prairie Police Departments were "working similar offenses," and that "the Grand Prairie offense was on May 9th," but they "did not have the details" about those earlier robberies. ROA.144.

ROA.1118. As more Flock scans showed up, Wolman conveyed the current location data to other officers who were on their way to find and follow the Hyundai. ROA.275; ROA.1118-1119. The Flock database recorded five hits at a particular location in Arlington between 4:49 p.m. and 6:16 p.m. ROA.152.

Some officers drove to the Lake Front Trail address to wait, while others caught up with the black Hyundai near the location of the Flock hits. ROA.275. Officers surreptitiously followed the Hyundai into a city park in Arlington, where it parked next to a white Dodge Journey SUV with dealer tags. ROA.270. Officers then saw Mr. Brownlee emerge from the passenger side of the black Hyundai SUV and move into the passenger seat of the white Dodge Journey. ROA.270. Officers followed both cars to the Lake Front Trail address, where they briefly stopped, then left separately. ROA.153. Officers stopped both cars.

At the time of the traffic stop, Mr. Brownlee was sitting in the Dodge Journey's passenger seat. ROA.270. The driver was Ashley Scott, who was later identified as his girlfriend, getaway driver, accomplice, and co-conspirator for some of the Cash Store robberies. *See* ROA.1291-1303. Officers searched the Dodge Journey and found two pistols, $3,783 in cash, Ashley Scott's cellular phone, Mr. Brownlee's cellular phone, and clothing that would be linked to the robberies. ROA.156; ROA.270. They also

found a copy of the title for the white Dodge Journey, which had been purchased earlier that day by Mr. Brownlee's sister, Kearra Simmons. ROA.1131.

Kearra Simmons was also the registered owner of the black Hyundai Santa Fe that officers had tracked using the Flock database. When police stopped the Hyundai around the same time, Simmons was driving. ROA.271. She and her children were released at the scene, but officers seized her Hyundai Santa Fe and had it towed to the Grapevine Police Department. They later obtained search warrants for both vehicles.

Later that evening, Simmons called Detective Wolan to request return of her phone. She told him that she routinely allowed Mr. Brownlee to borrow her Hyundai Santa Fe, and that he had borrowed it earlier that day (May 21) from around 2:30 p.m. until around 6:00 p.m. ROA.274. Simmons denied any involvement with the Cash Store robberies. ROA.274.

### 1.4. After the district court denied Mr. Brownlee's motion to suppress the fruits of the Flock searches, the Government relied on that evidence to prove his guilt.

Mr. Brownlee moved to suppress all evidence obtained through the unwarranted searches of Flock's surveillance database. ROA.129-141. Relying on *Carpenter v. United States*, 585 U.S. 296 (2018), and *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), he argued that officers violated his "reasonable expectations of privacy when they: 1) established a pervasive system of visual surveillance throughout" the

Metroplex; "2) repeatedly photographed vehicles in which Defendant traveled, 3) maintained a searchable database containing these photos, and 4) searched for vehicles in which Defendant traveled." ROA.133. He urged the district court to set the case for a hearing, where he could prove "that Flock cameras track everyone who drives or rides in a vehicle in or through the mid-cit[ies] or Western DFW region." ROA.133.

Even without firm numbers, he pointed to undisputed evidence that Flock cameras were ubiquitous. Euless Detectives started their search with only a vague description of the suspect automobile (a black Hyundai or Kia SUV), and quickly found Flock photos of Simmons's Hyundai Santa Fe within "a few hundred feet of the Grapevine robbery"; in close proximity to the Euless robbery; and at least five times in the vicinity of I-20 and Collins Street in Arlington, which allowed officers to quickly find the Hyundai and surveil it. ROA.135. "This outcome alone demands either an enormous volume of vehicle photographs or a wildly improbable coincidence." ROA.135

The district court denied the motion to suppress. ROA.413-423. The court decided not to hold an evidentiary hearing based on the Government's assertion that the "facts underlying the Motion are uncontested." ROA.420. The court decided that Mr. Brownlee lacked standing to object to the surveillance of the Hyundai Santa Fe. ROA.420-421. The court wrote that Mr. Brownlee "does not contend that he ever occupied the Hyundai or had a property or possessory interest in either vehicle."

ROA.421. In reality, Mr. Brownlee repeatedly asserted that the Flock searches targeted the "vehicles in which he traveled." ROA.129, ROA.130. He admitted that officers observed him at the park exiting the Hyundai and entering the Dodge Journey. ROA.135. And he offered Wolman's police report confirming that his sister had lent him the car when the images were captured and when the subsequent searches were performed. ROA.157. The district court held in the alternative that the police's use of Flock's database was not a "search" under the Fourth Amendment. ROA.421-423.

At trial, the Government elicited extensive testimony about officers' use of the Flock database. *See* ROA.1079-1095; ROA.1108-1112; ROA.1115-1121; ROA.1141-42. The Government also presented Flock photographs and metadata as substantive evidence of guilt. *See* Gov't Exs. 43, 44, 45, 46, ROA.1772-1775. The Government relied on the Flock evidence in its closing argument. ROA.1539-1541.

Beyond the photographs, data, and testimony taken directly from Flock's database, the Government also offered and relied on evidence seized as an immediate result of those Flock searches. As explained above, the Flock searches allowed Euless and Grapevine police to identify the specific Hyundai Santa Fe that Mr. Brownlee had borrowed from his sister, enabled reconstruction of the vehicle's earlier movements on May 21 and May 18, and ultimately led police directly to the automobile and its occupants, who had not yet even been identified. That, in turn, led police to stop both

vehicles, including the Dodge Journey, and to a mountain of evidence used to convict him at trial, including phones, cash, clothes, and firearms.

### 2. The district court denied Mr. Brownlee's motion to dismiss the five firearm charges under 18 U.S.C. § 924(c) because it believed that Hobbs Act robbery and attempted robbery are divisible offenses.

The Second Superseding Indicment charged Mr. Brownlee with five counts of brandishing a firearm during a crime of violence. ROA.316-320 (Counts Seven through Ten). All those charges were predicated on the view that a completed robbery under the Hobbs Act is categorically a "crime of violence." Mr. Brownlee moved to dismiss the § 924(c) counts because *attempted* robbery and *completed* robbery are a single, indivisible offense, and that offense can be committed without using, attempted to use, or threatening to use physical force against the person or property of another. ROA.121-128; *see* ROA.334-335.[24] The district court denied his motion. ROA.299-300; ROA.338.

At trial, the jury convicted Mr. Brownlee of all five § 924(c) counts and explicitly found that he brandished a firearm in each instance. ROA.582-584. Under 18 U.S.C.

[24] The grand jury (or grand juries) returned a total of three indictments against Mr. Brownlee. *See* ROA.26-34, 89-101, 309-323. Mr. Brownlee first raised his divisibility argument in a motion to dismiss the § 924(c) charges in the December 2024 Superseding Indictment. ROA.121-128. The district court denied that motion on February 5, 2025. ROA.299-300. Seven days later, the grand jury returned a Second Superseding Indictment that charged five § 924(c) violations. ROA.316-320. Mr. Brownlee renewed the divisibility argument. ROA.334-335. On March 6, 2025, the district court denied the renewed motion. ROA.338.

§ 924(c)(1)(A)(ii), those verdicts required the court to impose five mandatory consecutive penalties of seven years in prison. Altogether, the five § 924(c) convictions were responsible for 35 years of the 60-year sentence. Without those convictions, there would be no mandatory minimum sentence, no mandatory consecutive sentence, and a lower Guidelines range.[25]

## Summary of the Argument

1. The district court should have granted Mr. Brownlee's motion to suppress the fruits of the unwarranted searches of the Flock Safety database. First, the police use of the Flock network and database was a "search" for purposes of the Fourth Amendment. Flock's comprehensive surveillance database impinges on drivers' and passengers' reasonable expectations of privacy in the whole of their physical movements. The system constantly monitors drivers throughout the nation and maintains at least 30 days' worth of comprehensive location history in easily searchable format. In these circumstances, the Fourth Amendment requires a warrant supported by probable cause. Police did not obtain a warrant.

---

[25] Assuming no other changes to the PSR, the Guidelines Range for the remaining offenses would be, at most, 360 months–life without the § 924(c) convictions. *See* PSR at 14–15, ¶¶ 52, 60 (citing U.S.S.G. § 2K2.4, cmt., n.4); *see also* PSR at 17, ¶¶ 82, 84.

The combined § 924(c) charges raised the Guidelines range to 682–747 months. *See* PSR at 17, ¶ 86.

Second, Mr. Brownlee had standing to challenge the unwarranted search because law enforcement used the system to monitor *his* historical and current location *while* he occupied that automobile. Alternatively, he had a cognizable possessory interest because the Hyundai Santa Fe's owner had given him permission to possess and use the vehicle. That gave him all the same rights as a common-law bailee.

2. The district court should have dismissed the 18 U.S.C. § 924(c) counts. Those firearm charges were each predicated on a completed robbery, but an analysis of governing law shows that *attempted* robbery and *completed* robbery are a singular indivisible offense. Attempted robbery does not satisfy § 924(c)'s definition of "crime of violence." Alternatively, Mr. Brownlee would preserve, for further review, the claim that substantive or completed Hobbs Act robbery prohibits conduct outside that same definition.

## Argument

### I. The district court should have granted Mr. Brownlee's motion to suppress the fruits of the Flock searches.

Mr. Brownlee's motion to suppress explained that companies like Flock Safety had worked with police to create "a system of surveillance cameras and information storage so pervasive that the police effectively track every vehicle" that travels through a covered city, constantly and "in real time." ROA.131. Flock maintains its compre-

hensive locational data for at least 30 days and makes that data available to participating police departments without judicial intervention nor oversight. ROA.260. Here, police used the pervasive surveillance system to identify the automobile in which Mr. Brownlee traveled, reconstruct that travel, find the automobile's current location using real-time scans, and, ultimately, arrest Mr. Brownlee, search two vehicles, seize evidence, and convict him. Critically, police used Flock's extensive location-surveillance data without securing a warrant and with no other external oversight.

Even so, the district court denied Mr. Brownlee's motion to suppress. ROA.420-423. The court decided that police use of the Flock system was not a "search" and that Mr. Brownlee lacked standing to argue otherwise. ROA.420-423. Both decisions were wrong.

**A. Appellate review is plenary and de novo.**

When a defendant appeals the denial of his motion to suppress evidence under the Fourth Amendment, this Court reviews legal conclusions *de novo* and factual findings for clear error. *United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024) (quoting *United States v. Perez*, 484 F.3d 735, 739 (5th Cir. 2007). The "threshold question"—whether law enforcement's use of technology "is a search under the Fourth Amendment"—is a legal question. *Id.*; *see also Carpenter v. United States*, 585 U.S. 296, 303–16 (2018). The Court also reviews *de novo* "the legal question of whether a defendant has

standing to challenge an allegedly illegal search as violative of the Fourth Amendment." *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996) (citing *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037 (5th Cir.1990)).

Mr. Brownlee preserved plenary appellate review by moving to suppress the fruits of the unwarranted and unreasonable Flock searches. ROA.129-141; *see* Fed. R. Crim. P. 51(b).[26]

### B. Police performed a "search" (or multiple searches) under the Fourth Amendment when they collected and utilized the Flock database.

This Court should hold that law enforcement's use of the Flock database was a "search" for purposes of the Fourth Amendment. The Constitution protects Americans' reasonable expectations of privacy, including the expectation of privacy in the whole of their physical movements. Police impinge on that expectation and perform a "search" when they use powerful electronic locational surveillance to track or reconstruct a vehicle's movements over a period of several days. That is exactly what happened here.

[26] "A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). Here, Mr. Brownlee made clear at trial that he continued to assert those arguments when the Government offered some of the results of the Flock searches. ROA.1085.

On the afternoon of May 21, Euless Police detectives accessed Flock Safety's nationwide surveillance database to search for photographs and other data regarding all black Kia or Hyundai SUVs that had moved near the location of the Grapevine robbery. ROA.145. That was a "search" for purposes of the Fourth Amendment. They then performed additional searches to reconstruct the movements of one or more of those black SUVs. They ultimately identified and zeroed in on one Hyundai Santa Fe—the one owned by Keisha Simmons and occupied by her brother, Mr. Brownlee. Police in Euless and Grapevine performed additional searches to reconstruct that vehicle's historical movements and to pinpoint its current location.

By using this database without a judicial warrant, police violated Mr. Brownlee's reasonable expectation of privacy. The district court's contrary conclusion was inconsistent with binding precedents from the Supreme Court and this Court.

**1. Police perform a "search" when they violate a person's reasonable expectation of privacy.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV.

The Founding Generation codified the Fourth Amendment "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024) (quoting *Carpenter v. United States*, 585 U.S. 296, 303 (2018)). Their "central aim" was "'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States* v. *Di Re,* 332 U.S. 581, 595 (1948)).

Fourth Amendment "searches" fall into two (possibly overlapping) buckets: trespass against *property*, and violation of *privacy*. *See generally United States v. Jones*, 565 U.S. 400, 403–08 (2012); *see also Smith*, 110 F.4th at 830 (quoting *United States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016)). This appeal chiefly focuses on the privacy rationale.

"For much of our history, Fourth Amendment search doctrine was 'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter*, 585 U.S. at 304 (quoting *Jones*, 565 U.S. at 405 & 406–07, n.3). The physical trespass rubric remains important in modern-day Fourth Amendment jurisprudence. *See Jones*, 565 U.S. at 406–07 n.3.

As remote surveillance technology became more powerful, the Government gained the ability to peer into the Americans' private lives *without* a physical trespass.

In response, the Supreme Court articulated an additional rubric for Fourth Amendment protections:

> When an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause

*Carpenter*, 585 U.S. at 304 (quoting *Katz v. United States*, 389 U.S. 347 (1967) (Harlan, J., concurring)).

The justices of the Supreme Court don't always agree about which paradigm—property or privacy—should govern particular Fourth Amendment cases. For example, the justices unanimously agreed in *United States v. Jones* that the Government violated the Constitution when it installed a secret tracking device on an automobile and monitored its movements over four weeks, but they disagreed about the proper rationale.

Justice Scalia's majority opinion focused on traditional concepts of property and trespass law. *See Jones*, 565 U.S. at 404–08. Justice Alito, joined by three other justices, agreed that police violated the Fourth Amendment, but only because monitoring the vehicle's movements for four weeks violated its occupants' reasonable expectations of privacy. *Id.* at 430–31. (Alito, J., concurring in the judgment). Justice Sotomayor embraced both views: she joined the majority opinion but *also* found that the electronic tracking of Jones's movements in the car "impinge[d] on expectations

of privacy." *Id.* at 415 (Sotomayor, J., concurring). She agreed with Justice Alito that four-week monitoring was a "search" under the privacy rationale, and strongly suggested the same result "[i]n cases involving even short-term monitoring." *Id.* at 415 (Sotomayor, J., concurring).

The Supreme Court has repeatedly and consistently held that the Fourth Amendment protects against Government invasion of *privacy*, even when the invasion does not involve a physical trespass. *See Carpenter*, 585 U.S. at 304 (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)) ("[P]roperty rights are not the sole measure of Fourth Amendment violations.").

**2. Americans enjoy a reasonable expectation of privacy in "the whole of their physical movements."**

The Fourth Amendment restricts the Government's ability to monitor Americans' everyday movements, even when those movements *could be* observed by a person standing in "public" (or by someone physically following the target). That proposition might have garnered debate in the past, but *Carpenter*, *Jones*, and *Smith* have put to rest any doubt.

*Jones* and *Carpenter* are the two most important Supreme Court decisions on this topic. As noted earlier, five justices wrote or joined opinions recognizing that vehicle tracking would violate reasonable expectations of privacy *regardless* of physical

trespass. *See Jones*, 565 U.S. at 415 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring in judgment).

Justice Alito, in an opinion joined by Justices Ginsburg, Breyer, and Kagan, mused that police might be allowed to engage in "relatively short-term monitoring of a person's movements on public streets" without infringing on reasonable expectations of privacy. *Id.* at 430. To illustrate what he meant by "short-term monitoring," Alito cited the Court's earlier decision in *United States v. Knotts*, 460 U.S. 276, 281–82 (1983). There, the Government physically followed "an automobile on public streets and highways" during a single trip using an undercover car and a manned aircraft. *Knotts*, 460 U.S. at 279–81. Police were aided by a "beeper," which was a radio transmitter surreptitiously planted in a chemical container before the suspects purchased it.[27]

The electronic surveillance in *Jones* was different. Rather than physical observation of a single trip, police maintained near-perfect surveillance over many days: "We need not identify with precision the point at which the tracking of this vehicle became

[27] Officers secured the seller's permission before installing the beeper inside the container, and the defendant did not "challenge the warrantless installation of the beeper in the chloroform container." *Knotts*, 460 U.S. at 280 n.**. The Supreme Court expressed no opinion on that aspect of the surveillance. *Id.*

a search, for the line was surely crossed before the 4-week mark." *Jones*, 565 U.S. at 430.

Justice Sotomayor agreed with Justice Alito that " at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" 565 U.S. at 415 (quoting *id.* at 430). But Justice Sotomayor also expressed several reasons why even *short-term* locational monitoring could infringe on American's privacy:

> GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. … The government can store such records and efficiently mine them for information years into the future. … And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: "limited police resources and community hostility."

*Jones*, 565 U.S. at 415–16 (Sotomayor, J., concurring).

In *Carpenter*, the Supreme Court held that the Government performed a Fourth Amendment "search" when it acquired seven days' worth of a suspect's "wireless carrier cell-site records," abbreviated CSLI. 585 U.S. at 306. The majority adopted and repeatedly cited the common ground in Justice Sotomayor's and Justice Alito's *Jones*

opinions. *See Carpenter*, 585 U.S. at 310 ("A majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements.").

Applying the teachings of *Carpenter* and *Jones*, this Court held in *Smith* that "law enforcement *did* conduct a search when it sought Location History data from Google" through a so-called "geofence warrant." 110 F.4th at 836.[28] Together, *Jones*, *Carpenter*, and *Smith* recognize that the American people have a reasonable expectation that their everyday movements will be free from routine government monitoring. The Fourth Amendment protects against unwarranted pervasive locational surveillance.

### 3. Police violate reasonable expectations of privacy when they use Flock's permeating locational surveillance to reconstruct citizens' current and historical movements.

Flock's surveillance database indiscriminately collects a vast trove of locational data about Americans who drive or ride in cars. By capturing, storing, retrieving, and indexing this data, Flock gives police the power to find almost anyone and reconstruct their movements over the last 30 days, "[w]ith just the click of a button." *Carpenter*, 585 U.S. at 311.

[28] The Supreme Court recently agreed to hear a case about geofence warrants. *See Chatrie v. United States*, No. 25-112, 2026 WL 120676, at *1 (U.S. Jan. 16, 2026).

In *Carpenter*, the Supreme Court held that law enforcement performed a "search" when it accessed a suspect's CSLI—electronic data "revealing the location of Carpenter's cell phone whenever it made or received calls." 585 U.S. at 306. The Court held that accessing historical CSLI was a "search" because it "partakes of many of the qualities of the GPS monitoring we considered in *Jones*." *Id.* at 309. And, in *Smith*, this Court held that many of the concerns that motivated *Carpenter* were "highly salient" when evaluating data collected through "geofence warrants." *Smith*, 110 F.4th at 832.

The same is true of the Flock database. Like GPS, CSLI, and Google's Sensorvault location data, Flock's locational surveillance data provides a "detailed, encyclopedic, and effortlessly compiled" record of current and historical movements over a period of at least thirty days. *Carpenter*, 585 U.S. at 309. Routinely capturing the movements of every passing motorist at a variety of strategic, unmanned, 24-hour checkpoints creates "the potential for 'permeating police surveillance.'" *Smith*, 110 F.4th at 833. That potentiality becomes reality when the police or their agents collect, analyze, and share the data, allowing free access without any intermediary.

"Moreover, the retrospective qualify of the data here gives police access to a category of information otherwise unknowable." *Carpenter*, 585 U.S. at 312. The data creates a "comprehensive chronicle" of an individual's movements, and through those

movements, reveals "his familial, political, professional, religious, and sexual associations." *Id.* at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). In the words of Detective Phillip Wolman below, Flock's locational and photographic database "usually" reveals a target's entire "pattern of life." ROA.1120.

Flock Safety's location data may not contain quite as many "hits" as a GPS tracker, a wireless carrier's CSLI, or Google's Sensorvault, but each Flock hit provides more detailed and specific geographic data than CSLI or GPS. Cf. *Smith*, 110 F.4th at 833 (noting that Google's Sensorvault "provides more precise location data than either CSLI or GPS"). While CSLI approximates location within sectors that may span several city blocks,[29] Flock cameras capture the *precise location* of a vehicle at an *exact moment in time*, complete with photographic evidence. The cameras record not just that a vehicle was in a general area, but its specific position on a particular street, traveling in a specific direction, at a precise timestamp.

As with geofences, CSLI, and GPS, "obtaining data through" Flock's database "is 'remarkably cheap, easy, and efficient compared to traditional investigative tools.'" *Smith*, 110 F.4th at 833 (quoting *Carpenter*, 585 U.S. at 311). In fact, once a city or its

[29] *See Carpenter*, 585 U.S. at 324 (Kennedy, J., dissenting).

police department has paid for the cameras and paid to access the database, each additional Flock search is effectively free.

Moreover, Flock Safety operates tens of thousands of cameras across the United States, creating a vast surveillance network. When police query the database, they can retrieve 30 days' historical data showing every instance a specific vehicle passed any Flock camera anywhere in the country, and they can also identify every vehicle that passed a camera within whatever geographic parameters an officer chooses to request. Without leaving the comfort of an office, a detective can "reconstruct a person's movements" using an unsleeping network of cameras and cloud storage that is entirely separated from "the frailties of [human] recollection" and observation. *Carpenter*, 585 U.S. at 312. Police can reconstruct an individual's past movements long after the fact, even when those movements were made before the person did anything to engender suspicion.

Here, the district court found that the surveillance network extended all the way to a home: both the Flock database and the similar Vigilant database captured "multiple images of the Hyundai" when it was parked outside a residential address in Arlington. ROA.414. As with CSLI, Sensorvault data, or GPS monitoring, this precise "time-stamped data provides an intimate window into a person's life." *Carpenter*, 585 U.S. at 311; accord *Smith*, 110 F.4th at 834 ("The question is whether Location History

data has the capability of revealing intimate, private details about a person's life, thus conferring a 'reasonable expectation of privacy.'"); *cf. Jones*, 565 U.S. at 415 (Sotomayor, J., concurring).

Like CSLI collection, Flock surveillance is automatic, indiscriminate, and inescapable. *Carpenter* gave significant weight to the fact that individuals have no practical ability to avoid generating CSLI: "Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data." 585 U.S. at 315; *see also Smith*, 110 F.4th at 832 (quoting *Carpenter*). The involuntary nature of the data-collection distinguished CSLI from truly voluntary disclosures to third parties.

Flock surveillance is even more inescapable than cell phone location tracking. While individuals can, theoretically, choose not to carry a cell phone, driving is effectively mandatory for most Americans to participate in modern life—to commute to work, transport children, access healthcare, purchase necessities, and exercise countless other aspects of daily living. In many communities, there is no realistic alternative to automobile transportation. *See* Cox & Alm, *supra* (In the Metroplex, access to an automobile "is more necessity than convenience.").

"[Q]uite a few" of those cities have installed Flock surveillance cameras, and many of those cities made their surveillance data accessible to police nationwide. ROA.1082. Drivers and passengers in any covered cities have no way to avoid Flock

cameras without ceasing to drive entirely. The cameras operate continuously and indiscriminately, photographing every passing vehicle regardless of any suspicion of wrongdoing. *See* ROA.1098. This is the epitome of the "dragnet-type law enforcement practices" that the Fourth Amendment was designed to prevent. *Knotts*, 460 U.S. at 284.

Like the initial searches performed in response to a geofence warrant, detectives' initial "blind search"[30] for black SUVs was made "while law enforcement officials have *no idea* who they are looking for, or whether the search will even turn up a result." *Smith*, 110 F.4th at 837.

The automatic nature of Flock data collection also means, as in *Carpenter*, that it occurs "without any affirmative act on the part of the user beyond powering up"—or in this case, simply driving on public roads. 585 U.S. at 315. Drivers do not voluntarily "share" their location with Flock Safety in any meaningful sense; they are simply captured by omnipresent cameras as they go about their daily lives.

#### 4. A private company collects and maintains the surveillance database, but that does not eliminate Fourth Amendment protection.

Flock Safety should not be considered a *third* party for purposes of the Fourth Amendment. Flock only acquires its photographs and other locational surveillance

[30] ROA.145; ROA.262

data because city governments ask it to install cameras on government-owned right-of-way. Flock provides some services to private customers, but it only makes its nation-wide surveillance database available to cooperating police agencies. Though Flock is a private entity and therefore not subject to any direct democratic control, it operates as an arm or agent of its client law enforcement agencies when it sets up and maintains the surveillance system.

But even if Flock were viewed as a true third party, that would not change the outcome. In *Carpenter*, the users' CSLI was captured and maintained by private wire-less phone providers "for their own business purposes." 585 U.S. at 301. Yet the Court held that the Government performed a "search" when it obtained and utilized the CSLI from those carriers. Similarly, in *Smith*, this Court recognized that the Govern-ment performed a Fourth Amendment "search" when it leveraged a private company's massive electronic collection of location data. 110 F.4th at 837.

**5. Flock's nationwide surveillance dragnet is dissimilar in kind and degree from traditional surveillance by physical observation.**

Relying on cases in which police officers physically observed a suspect's vehicle, the district court concluded that the Flock database search was not a "search." ROA.422-423 (discussing *New York v. Class*, 475 U.S. 106, 112–13 (1986); *United States v. Ellison*, 462 F.3d 557, 561, 563 (6th Cir. 2006); and *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (1999)).

In all three of those decisions, the officers were physically present on the scene and personally observed and interacted with a singular suspect vehicle. *See Class*, 475 U.S. at 108 (holding that physical inspection of a vehicle identification number, which by law must be visible from the exterior of the car, would not violate a driver's reasonable expectation of privacy); *Ellison*, 462 F.3d at 559 (holding that an officer did not violate a driver or vehicle owner's reasonable expectation of privacy when he observed the vehicle's license plate number and then searched a law enforcement database using that number); *Olabisiomotosho*, 185 F.3d at 529 (rejecting the defendant's Fourth Amendment challenge to officers' visual observation of a license number and contemporaneous search of a law enforcement database).

All three cases involve police conduct that is different in both kind and degree from the pervasive, dragnet-style electronic surveillance at issue here. *Carpenter* rejected explicitly rejected this sort of false analogy between "sweeping" electronic surveillance and "rudimentary" flesh-and-blood observation of a single "journey":

> This Court in *Knotts*, however, was careful to distinguish between the rudimentary tracking facilitated by the beeper and more sweeping modes of surveillance. The Court emphasized the "limited use which the government made of the signals from this particular beeper" during a discrete "automotive journey." Significantly, the Court reserved the question whether "different constitutional principles may be applicable" if "twenty-four hour surveillance of any citizen of this country [were] possible."

*Carpenter*, 585 U.S. at 306–07 (quoting *Knotts*, 460 U.S. at 283, 284, 285) (internal citations omitted).

To the extent that the district court meant that the information gained from the Flock database about Mr. Brownlee's travel (along with everyone else's travel) past the strategically placed Flock cameras *would have* been publicly accessible *if an officer had been following* his car, that is insufficient. *See Jones*, 565 U.S. at 409 ("*Knotts* would be relevant, perhaps, if the Government were making the argument that what would otherwise be an unconstitutional search is not such where it produces only public information. The Government does not make that argument, *and we know of no case that would support it*." (emphasis added)).

Police here used Flock's database to search through *all* the vehicles that passed within a given area during some defined period of the past. Flock cameras capture images and locational metadata universally, indiscriminately, and without any suspicion of wrongdoing. The system also assigned a "fingerprint"[31] to individual vehicles using powers of observation, recall, and analysis that no mortal human has ever possessed.

[31] *See also* Order Denying Motion to Dismiss, *Schmidt v. City of Norfolk*, No. 2:24-cv-621, 2025 WL 410080, at *1 (E.D. Va. Feb. 5, 2025) ("Flock's software uses machine learning to take the information it obtains from the camera images to create a 'Vehicle Fingerprint.'").

*Carpenter* and *Jones* explicitly held that comprehensive, weeks-long electronic tracking of a *single* vehicle crosses the constitutional line in a way that *Knotts*'s limited physical observation did not. Like GPS, CSLI, and Sensorvault data, Flock's system enables surveillance that would be *impossible* through traditional methods. No police force could station officers atop twelve-foot poles at thousands of locations for unceasing 24/7 shifts capturing perfect photographs of every passing vehicle. And even if there were such a force, it would not give random officials in other parts of the country the instant ability to review all the black Hyundai or Kia SUVs that passed through a particular neighborhood at a particular time, nor would it allow detailed and instantaneous report of a chosen vehicle's current movements. *Carpenter* emphasized that courts should not uncritically extend Fourth Amendment doctrines developed for an analog world into the "qualitatively different category" of electronic location data 585 U.S. at 309.

### C. The Fourth Amendment requires a particularized warrant supported by probable cause.

#### 1. Police used the Flock database without any judicial oversight.

The Flock database searches here were performed without *any* judicial oversight and without a particularized warrant supported by probable cause. In *Jones*, *Carpenter*, and *Smith*, police *consulted* a judicial officer before engaging in electronic locational surveillance. In each case, that consultation was "constitutionally insufficient." *Smith*,

110 F.4th at 837; *see also Jones*, 565 U.S. at 402–03; *Carpenter*, 585 U.S. at 307 n.2; *id.* at 334 (Kennedy, J., dissenting) (quoting 18 U.S.C. § 2703(d)). But at least they tried.

Here, police did not have to approach an arms-length third party for the data and they freely searched the Flock database without any sort of judicial consultation. The absence of a particularized warrant means the Flock searches were presumptively unreasonable under the Fourth Amendment. And nothing rebuts that presumption.

As explained below, police's unfettered access to the Flock database leaves individual citizens and the population as a whole subject to extensive locational surveillance based on whim or malice. Without any semblance of judicial authorization, police searched a database containing millions of timestamped datapoints to review the travel history of black Hyundai and Kia SUVs that drove past specified areas, essentially on a hunch.

**2. The Flock locational surveillance database presents new and troubling opportunities for abuse.**

When analyzing the constitutionality of a new surveillance technology, courts worry about the potential for abuse at both the individual and population levels. *See Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) ("[T]he government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse.").

*Carpenter* expressed deep misgivings about the Government's growing and unprecedented power to monitor citizens' lives, and specifically their movements, using

technology. 585 U.S. at 305. This Court shared those concerns in *Smith*, 110 F.4th at 833. As with CSLI and geofence data, Flock Safety's database is a powerful mechanism of surveillance, and therefore police should not have free rein to search without first demonstrating particularized probable cause.

"Our Founders recognized that the government will not always be comprised of publicly spirited officers—and that even good faith actors can be overcome by the zealous pursuit of legitimate public interests." *Smith*, 110 F.4th at 833 (Ho, J., concurring). "It's because of 'human nature' that it's 'necessary to control the abuses of government.'" *Id.* (quoting The Federalist No. 51, at 349 (J. Cooke ed. (1961))). The Court need not speculate about whether individual officers might misuse their unmediated access to surveillance data like Flock's—they already have.

Officers[32] from[33] across[34] the[35] country[36] have[37] used[38] the technology to spy on current or former paramours. None of these improper uses of the Flock database would have occurred if police were required to secure a particularized warrant supported by probable cause before the search.

Closer to home, a man contacted police in Johnson County, Texas—just south of Fort Worth—and accused his girlfriend of purposefully taking medication induced the loss of a not-yet-viable pregnancy, then running away.[39] An officer searched Flock's

---

[32] Olivia Lloyd, *Cop stalks girlfriend, runs her license plate 70 times in 7 months, Florida cops say*, Miami Herald (Feb. 7, 2025), https://perma.cc/CV9S-M8NW

[33] *NEW DETAILS: Former Braselton Police Chief accused of stalking; judge denied protective order*, WSB-TV 2 (Nov. 24, 2025), https://perma.cc/67MK-99YV

[34] Michael Stavola, *Kansas police chief used Flock license plate cameras 164 times to track ex-girlfriend*, Wichita Eagle (Aug. 17, 2024), https://perma.cc/YPW4-U38Q

[35] Hailey Tucker, *FF12: Kechi officer stalking incident prompts concerns about WPD 'FLOCK' technology*, KWCH 12 News (Oct. 31, 2022), https://perma.cc/4TTB-Y43V

[36] Thomas Gruel, *North Charleston Police officer demoted for using cameras to track wife*, WCSC (June 24, 2024), https://perma.cc/7K33-HFG4

[37] Sarah Motter, *Joplin officer no longer employed after alleged misuse of license plate tracking system*, KCTV 5 (Jan. 12, 2026), https://perma.cc/Z7SV-XYH9

[38] Brian Kerhin, *Menasha police officer accused of using license plate recognition system to track his ex*, Fox 11 News (Jan. 9, 2026), https://perma.cc/C9DQ-SRSR

[39] Cameron Probert, *Eastern WA Flock cameras were searched after false abortion claim*, Tri-City Herald (Feb. 5, 2026), https://perma.cc/W6EL-C4ZD

nationwide network of 83,000 cameras to try and find the woman,[40] even though the allegations did not describe anything that would be criminal under Texas law.[41] Even if the complaint were true, this use of the technology would be controversial.

After performing that search, officers decided that the man was lying. He was recently indicted for pointing a gun at the girlfriend, threatening her, and choking or strangling her.[42] Flock's permeating surveillance database is just too easy for police. In that case, they unwittingly helped a violent abuser trying to track down a victim who had summoned the courage to escape.

As with the examples described above, compliance with the Fourth Amendment would have prevented this scenario entirely.

In 1791, English philosopher and jurist Jeremy Bentham published a series of letters describing what he believed to be a theoretically perfect prison: the "Panopticon." Ideally, Bentham mused, every prisoner would be under observation by guards "during every instant of time."[43] Believing that level of surveillance to be "impossible,"

---

[40] Jordan Elder, *Tracked across state lines: Texas sheriff's use of license plate data raises alarms*, News 4 San Antonio (June 17, 2025), https://perma.cc/4PTT-LAEB

[41] Emily Brindley, *After abortion report, North Texas cop used surveillance network to look for woman*, Dallas Morning News (June 13, 2025), online at https://perma.cc/Z6DZ-RC6U

[42] *See* Indictment, *State v. De La Rosa*, No. DC-F202500899 (Johnson Cnty., Tex. Dist. Ct. filed Oct. 1, 2025).

[43] Jeremy Bentham, *Panopticon; or, the Inspection House* 3 (1791)

even in an confined space like a prison, Bentham theorized that the next best thing would be if every prisoner *felt* like he was being watched at all times, was *unable* to determine otherwise, and therefore, would *behave* as though he is being watched at all times.[44]

In her concurring opinion in *Jones*, Justice Sotomayor warned of the Panopticon-like effects of widespread and unfettered use of even short-term GPS monitoring for vehicles:

> Awareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net results is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfetterd discretion, chooses to track—may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'"

*Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

In *Smith*, this Court adopted Justice Sotomayor's reasoning as part of the rationale for its decision. *See Smith*, 110 F.4th at 837. The Court recognized that police

[44] *Id.* ("This being impossible, the next thing to be wished for is, that, at every instant, seeing reason to believe as much, and not being able to satisfy himself of the contrary, he should *conceive* himself to be so.").

had been using the geofence process to engage in "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). Geofence warrants were general warrants because police would use them to "rummage through troves of location data data from hundreds of millions of Google users without any description of the particular suspect or suspects to be found." *Id.* at 837–38.

Flock database searches pose the same or greater risks of upsetting the balance between government and citizen. "With just the click of a button," police can reconstruct the movements of a single car or thousands of cars over thirty days' time. *Smith*, 110 F.4th at 832 (quoting *Carpenter*, 585 U.S. at 311).

### D. Mr. Brownlee has standing to challenge the unwarranted Flock searches.

In addition to concluding that the Flock database searches were not a Fourth Amendment "search," the district court held that Mr. Brownlee lacked standing to complain about those searches. ROA.420-421. That conclusion was wrong for multiple reasons.

A defendant moving to suppress evidence "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978). "Standing," in this context, is not the same as Article III justiciability. Fourth Amendment standing is "not distinct from the

merits," and is "subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 584 U.S. 395, 410 (2018) (quoting *Rakas*, 439 U.S. at 139).

**1. The occupants of an automobile have a reasonable expectation of privacy in the whole of its movements.**

Fourth Amendment "standing does not require an ownership interest in the invaded area." *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011). The lawful occupants of a car have a reasonable expectation of privacy in the past and present movements of the car *while they are occupying it*, and that expectation of privacy is reasonable. Even Flock Safety denies the public access to its comprehensive nationwide collection of location data and photographs. Only police can access the data.

Police used the Flock Safety system to identify the vehicle Mr. Brownlee occupied, find that vehicle's current location, and reconstruct its historical movements. *All* occupants of the Santa Fe had a constitutionally cognizable expectation of privacy in those movements.

**2. Everyone agreed that Mr. Brownlee occupied the Hyundai Santa Fe during the times that the police were tracking it and reconstructing its movements.**

Inexplicably, the district court stated that that Mr. Brownlee "does not contend that he ever occupied the Hyundai." ROA.421. The motion to suppress explicitly acknowledged that Mr. Brownlee was in the Santa Fe on May 21 up until the time officers saw him change cars at the Arlington city park: "At the park, [officers] saw

Defendant Charles Brownlee get out of the Hyundai and enter a Dodge Journey." ROA.130. The Government agreed. ROA.237-238. Both parties submitted copies of police reports asserting the same. ROA.146; ROA.153; ROA.273; ROA.275. Both parties also submitted Wolan's report, which included Kearra Simmons's acknowledgement that she regularly allowed Mr. Brownlee to borrow her Santa Fe, and that Mr. Brownlee had in fact borrowed it on May 21. ROA.157; ROA.274.

If these allegations had been disputed, the district court would need to convene an evidentiary hearing to resolve that dispute. The court refused to hold a hearing on the assumption that the relevant facts were undisputed but then made a factual finding that contradicted the undisputed evidence.

**3. Alternatively, as a bailee with his sister's permission to possess and use her Hyundai Santa Fe, Mr. Brownlee had a possessory right superior to all others.**

Even if Mr. Brownlee were required to show a *possessory* interest in the Hyundai Santa Fe, he did so. The relevant facts were "uncontested." ROA.420.

Detective Wolan's police report recorded the substance of a conversation he had with Kearra Simmons, who was the registered owner of the Hyundai Santa Fe (and the Dodge Journey). Simmons told the detective that Mr. Brownlee was her brother; that she sometimes allowed him to "borrow" her Hyundai; and that he had in fact "borrowed" the Hyundai on May 21 from around 2:30 p.m. until around 6

p.m. ROA.157. Most of the Flock search results used by police in this case were captured during this window. *See*, e.g., ROA.1774-1775 (photograph captured at 3:34 p.m. on May 21); ROA.152 (discussing five Flock hits in Arlington, Texas, between 4:49p.m.–6:16 p.m.). By utilizing both historical and current location data captured during this timeframe, police were able to find the Hyundai, follow it to a city park, and watch Mr. Brownlee exit the Santa Fe and move into the Dodge Journey. They used the knowledge gained from their unwarranted search of the Flock Database to stop, search, and arrest.

Whether the Court addresses standing from a privacy standpoint or from a possessory standpoint, Mr. Brownlee has the same status and standing as the defendant in *Jones*, 565 U.S. at 404 n.2 ("If Jones was not the owner he had at least the property rights of a bailee."). There, the car was owned by Jones's wife. *Id.* Here, the Hyundai Santa Fe was owned by Mr. Brownlee's sister. Both had lawful permission to use the vehicle, both had possessory rights superior to anyone other than the relevant family member, and both had a reasonable expectation of privacy in their physical movements that was infringed by Government electronic surveillance.

## II. Properly understood, the Hobbs Act violations charged in Counts Two, Three, Four, Five, and Six were not "crimes of violence" for purposes of 18 U.S.C. § 924(c).

### A. The standard of review is *de novo*.

This Court reviews *de novo* whether a Hobbs Act conviction satisfies 18 U.S.C. § 924(c)'s definition of "crime of violence." *United States v. Bowens*, 907 F.3d 347, 351 (5th Cir. 2018). Mr. Brownlee preserved plenary review by moving to dismiss all the § 924(c) counts. ROA.121-128, 334-335.

### B. The Hobbs Act indisputably criminalizes conduct outside § 924(c)'s definition of "crime of violence."

Title 18, Section 924(c) "threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes." *United States v. Davis*, 588 U.S. 445, 448 (2019). As relevant here, the statute prohibits using or carrying a firearm "during and in relation to" a federal "*crime of violence*."[45] If the defendant *brandishes* a

[45] Title 18, Section 924(c)(1) provides, in pertinent part:

> (c) (1)
>
> (A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

firearm during a crime of violence, the statute requires a mandatory minimum sentence of seven years, and that sentence must run consecutively with any other term of imprisonment. 18 U.S.C. § 924(c)(1)(A)(ii), (c)(1)(D). Here, the jury convicted Mr. Brownlee of five § 924(c) violations. ROA.581-584. The district court thereafter imposed a total of 35 years' imprisonment for those five offenses, which was added to an already lengthy sentence of 25 years' imprisonment on the remaining counts. ROA.599.

The statute "define[s] the term 'crime of violence' in two subparts—the first known as the elements clause, and the second the residual clause." *Davis*, 588 U.S. at 449. The residual clause, § 924(c)(3)(B), "is unconstitutionally vague." *Id.* at 470. That leaves only the elements clause:

---

* * * *

> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.
>
> * * * *
>
> (D) Notwithstanding any other provision of law—
>
> (i) a court shall not place on probation any person convicted of a violation of this subsection; and
>
> (ii) no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

> (3) For purposes of this subsection [18 U.S.C. § 924(c)], the term "crime of violence" means an offense that is a felony and–
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another.

18 U.S.C. § 924(c)(3)(A).

The elements clause "poses the question whether the federal felony at issue 'has *as an element* the use, attempted use, or threatened use of physical force.'" *United States v. Taylor*, 596 U.S. 845, 850 (2022) (quoting 18 U.S.C. § 924(c)(3)(A)) (emphasis in *Taylor*). It does not matter *how* the defendant committed the predicate offense; the "only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *Id.*

Some violations of the Hobbs Act *do not* involve the use, attempted use, or threatened use of physical force. The statute prohibits various activities that interfere with commerce:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). In *Davis*, this Court recognized that a "does not necessarily require proof that a defendant used, attempted to use, or threatened to use force." *United States v. Davis*, 903 F.3d 483, 485 (5th Cir. 2018). The Supreme Court then affirmed this Court's holding that the residual clause is unconstitutionally vague. *United States v. Davis* 588 U.S. at 470.

In *Taylor*, the Supreme Court held that Hobbs Act *attempted* robbery sweeps more broadly than § 924(c)'s elements clause: "Look at the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force. … [T]o convict a defendant of attempted Hobbs Act robbery, the government does not have to prove any of those things." *Taylor*, 596 U.S. at 860.

### C. Attempted and completed Hobbs Act robbery are indivisible alternatives.

Section 1951(a)'s statutory overbreadth raises an important question: are the disjunctive alternative ways to violate its commands *elements* of divisible crimes, or are they merely alternative *means* of proving a single offense? *See Mathis v. United States*, 579 U.S. 500, 517 (2016). Applying binding precedent, at least two of the alternatives—robbery and attempted robbery—are a single, indivisible offense. The Court must conduct its categorical analysis on the undivided whole.

The Supreme Court has identified three different guideposts courts should use to determine whether a disjunctive statute defines one indivisible crime or multiple distinct crimes: (1) look for a decision in the convicting jurisdiction addressing jury unanimity; (2) see if the statute definitively resolves the issue "on its face" (i) by authorizing separate punishments, (ii) by providing a non-exhaustive list of illustrative examples, or (iii) by expressly defining certain alternatives as elemental; or (3) in the context of a prior conviction, examine the conviction record. *Mathis*, 579 U.S. at 517–18. Applying that rubric to *robbery* and *attempted robbery* leads to ineluctably to the conclusion that those alternatives compose a single, indivisible offense.

**1. Unanimity is the most important factor for analyzing divisibility.**

Begin with unanimity, which is the *sine qua non* of divisibility. *See Mathis*, 579 U.S. at 517–18 (discussing *Schad v. Arizona*, 501 U.S. 624, 636 (1991) (plurality opinion)). If convicting-jurisdiction precedents "dictate that a jury need not unanimously agree on the applicable alternative of the statute, the statute is indivisible and its alternative terms specify different means of committing a single offense." *United States v. Herrold*, 883 F.3d 517, 522 (5th Cir. 2018) (en banc), *vacated on other grounds*, 587 U.S. 1060 (2019), *reinstated in relevant part*, 941 F.3d 173, 177 (5th Cir. 2019) (en banc) ("[W]e reinstate that section (Part II) of our en banc decision.").

*Schad*'s plurality opinion describes two prototypical examples of non-elemental alternative means of proving murder. In one case, the evidence proved that the defendants caused the victim's death by shooting him or by drowning him; the Court recognized that "it was immaterial whether death was caused by one means or the other." *Schad*, 501 U.S. at 631 (discussing *Andersen v. United States*, 170 U.S. 481, 502–04 (1898)). In *Schad* itself, the Court rejected a constitutional challenge to Arizona's capital murder statute, which treated premeditation and commission-of-another-felony as alternative means "of satisfying a single *mens rea* element." *Id.* at 637 ("[T]he Arizona Supreme Court has authoritatively determined that the State has chosen not to treat premeditation and the commission of a felony as independent elements of the crime.").

This Court also acknowledges the connection between unanimity and divisibility. In Texas, a jury can return a unanimous guilty verdict for bodily injury assault despite disagreement about whether the act was done recklessly, knowingly, or intentionally. *Landrian v. State*, 268 S.W.3d 532, 537 (Tex. Crim. App. 2008). This Court has thus repeatedly held that those three alternatives are indivisible. *See*, e.g., *United States v. Stoglin*, 34 F.4th 415, 419 (5th Cir. 2022); *United States v. Gomez Gomez*, 23 F.4th 575, 577 (5th Cir. 2022); *Gomez-Perez v. Lynch*, 829 F.3d 323, 328 (5th Cir. 2016).

In *United States v. Garrett*, 24 F.4th 485, 489 (5th Cir. 2022), the Court held that that the two ways to commit Texas robbery (by fear or by causing injury) were divisible. Later, the Texas Court of Criminal Appeals rejected a unanimity challenge to those alternatives. *See Floyd v. State*, 714 S.W.3d 9, 13–15 (Tex. Crim. App. 2024), *reh'g denied* (Jan. 22, 2025). This Court immediately acknowledged that *Garrett* had been "unequivocally abrogated." *United States v. Rose*, 127 F.4th 619, 620 (5th Cir. 2025). This is yet more confirmation that apparent divisibility collapses in the face of binding unanimity precedent.

**2. Jurors can unanimously convict a defendant under § 1951(a) while disagreeing about completion.**

Here, there is a binding decision from this very Court on what should happen if the jury disagrees about "whether or not a crime had been completed": the jury should convict. *United States v. York*, 578 F.2d 1036, 1039 (5th Cir. 1978). The other circuits appear to agree that an indictment can charge both theories (attempt and completed crime) in a single count without duplicity. *See United States v. D'Amico*, 496 F.3d 95, 99 (1st Cir. 2007), *vacated on other grounds,* 552 U.S. 1173 (2008) (Hobbs Act); *see also United States v. Ramamoorthy*, 949 F.3d 955, 960-61 (6th Cir. 2020) ("There was no duplicity because, at least as charged here, sexual abuse and its attempt are not separate crimes.").

The Court has also repeatedly described both "robbery" and "attempted robbery" as part of a single "element" in this context. *See*, e.g., *United States v. Avalos-Sanchez*, 975 F.3d 436, 440 (5th Cir. 2020) ("A Hobbs Act violation has two elements: (1) robbery, extortion, or an attempt or conspiracy to rob or extort (2) that affects commerce."); *United States v. Robinson*, 119 F.3d 1205, 1212 (5th Cir. 1997) (citing *Stirone v. United States*, 361 U.S. 212, 218 (1960) ("There are thus two elements in a Hobbs Act prosecution: (1) a robbery, act of extortion, or an attempt or conspiracy to rob or extort; and (2) an interference with interstate commerce.").

And for many years, district courts instructed juries that they could convict defendants under § 1951(a) based on an *attempted* robbery or a *completed* robbery. *See*, e.g., *United States v. Robinson*, 67 F.4th 742, 746 (5th Cir. 2023); *see also United States v. Lott*, 64 F.4th 280, 284 (5th Cir. 2023) (quoting original trial's jury instructions).[46]

Following *Taylor*, the Court has held that § 924(c) cannot be predicated on attempted robbery, but has continued to affirm convictions that, in the court's view, were *in fact* predicated on completed robbery. *See Robinson*, 67 F.4th at 746. In *United*

[46] *Lott* only briefly addressed attempted robbery in a footnote. 64 F.4th at 287 n.1. The Court identified two reasons why it lacked jurisdiction to address that argument. First, the overall thrust of the opinion was that the defendants failed to prove that the sentencing court in fact relied on § 924(c)'s residual clause, which (under later arrogated precedent) was believed to be a jurisdictional requirement even for an authorized successive motion under 28 U.S.C. § 2255(h)(2). Second, the Certificate of Appealability did not include any mention of attempted robbery. 64 F.4th at 287 n.1.

*States v. Hill*, 63 F.4th 335, 363–64 (5th Cir. 2023), the Court *affirmed* a § 924(c) conviction predicated on aiding and abetting completed robbery but *vacated* convictions predicated on attempted robbery.

While the Court has thus assumed—at least implicitly—that substantive and attempted robbery are divisible, it has apparently never expressly analyzed the divisibility of § 1951(a) in a published opinion. In a recent unpublished opinion, the Court acknowledged the defendant's divisibility argument but then held it to be foreclosed by various cases that did not discuss divisibility. *See United States v. Madrid-Paz*, No. 22-20397, 2023 WL 7013354, at *2 (5th Cir. Oct. 24, 2023).

These cases may be an example of the tail wagging the dog. If previous panels simply assumed that completed and attempted robbery were divisible, without actually analyzing unanimity, then they do not count as "precedents" on that point. *Petteway v. Galveston Cnty.*, 111 F.4th 596, 608 (5th Cir. 2024) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

The Court should analyze § 1951(a) to determine whether the listed alternatives—interference by robbery or attempt—are truly distinct offenses for which the defendant is entitled to a unanimity instruction. The two theories are a single crime for

purposes of double jeopardy. Separate convictions from the same trial would merge into one. Consecutive punishment would be unlawful. *See* 18 U.S.C. § 3584(a). And, most importantly, a jury could unanimously convict while disagreeing about whether the crime was, in fact, completed. *York*, 578 F.2d at 1039.

**3. By specifying a single punishment in a single subsection, Congress suggested indivisibility.**

Turning to the other *Mathis* guideposts, the text of § 1951(a) is not definitive. The statue does not explicitly say whether obstruction-by-robbery and attempt are elemental alternatives. The statute provides a definitive list of theories, rather than an illustrative list of examples. And Congress specified only a single penalty.

Even though the text does not *definitively* resolve the question, it nonetheless suggests indivisibility. As a general rule, federal criminal law does not recognize a separate inchoate crime of "attempt." Sometimes, when Congress criminalizes attempts, it does so through a separate statute. *See*, e.g., 21 U.S.C. § 846. But here, Congress listed attempt and completed crime together in a single disjunctive sentence, attached to a single penalty.

**D. Mr. Brownlee wishes to preserve, for further review, the argument that even completed Hobbs Act robbery can be committed without the use, attempted use, or threatened use of physical force against the person or property of another.**

If completed robbery is a divisible offense, then Mr. Brownlee concedes that current Fifth Circuit precedent appears to foreclose any argument that a completed robbery can be committed without using, attempting to use, or threatening to use physical force against the person or property of another. Even so, he would urge the Court to hold that the statute defines "robbery" in a way that extends beyond § 924(c)'s elements clause.

In the Hobbs Act:

> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1). There are at least two ways this definition sweeps more broadly than § 924(c)(3)(A). First, the statute allows conviction where the defendant caused the victim to fear future injury to the vicitm's intangible property; and injury to intangible property need not be (and probably cannot be) caused by *physical* force. Cf. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 401–02 (2003) (discussing lower

court cases defining Hobbs Act extortion to include crimes involving intangible property); *but see United States v. Garcia-Ortiz*, 904 F.3d 102, 107 (1st Cir. 2018).

Second, the statute plainly allows conviction where the defendant threatens to harm *himself* or *his own property*. Section 924(c)(3)(A) requires harm, or threatened harm, to *someone else*'s person or property.

Mr. Brownlee concedes that the Court's precedents currently foreclose these two arguments, and that these arguments are distinct from the divisibility argument he raised in his motion to dismiss. In the event the Court decides that Hobbs Act completed robbery and attempt are divisible offenses, he raises these alternative arguments for further review.

## Conclusion

This Court should vacate the judgment below. It should hold that police performed a "search" under the Fourth Amendment when they utilized Flock Safety's cameras and database, and that Mr. Brownlee had standing to challenge that search. He also urges the Court to reverse the denial of his motion to dismiss the § 924(c) counts.

Respectfully submitted,

Jason D. Hawkins
Federal Public Defender for the
Northern District of Texas

/s/ *J. Matthew Wright*
Assistant Federal Public Defender
Texas Bar No. 24058188
600 South Tyler Street
Suite 2300
Amarillo, Texas 79101
Telephone: (806) 324-2370
Matthew_Wright@fd.org

*Attorneys for Mr. Brownlee*

**Certificate of Service**

I filed brief via the Court's ECF system on February 24, 2026. Opposing counsel, a registered filer, is deemed served.

/s/ J. Matthew Wright

## Certificate of Compliance

This brief contains 12,659 words, exclusive of exempted portions.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Goudy Old Style font. Footnotes are in 12-point font.

/s/ J. Matthew Wright