**U.S. Department of Justice**
United States Attorney
Northern District of Texas

*1100 Commerce St. 3rd Floor*
*Dallas, Texas 75242*
*Telephone (214) 659-8600*
*Fax (214) 659-8802*

October 7, 2026

Thomas B. Plunkett, III, Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

Re: Rule 28(j) Letter
*United States v. Brownlee*, No. 25-10855

Mr. Plunkett:

This letter addresses two issues that arose during oral argument.

*First*, on August 21, 2026, the D.C. Circuit held that "Hobbs Act robbery is a 'crime of violence' under [18 U.S.C.] § 924(c)." *United States v. Onyewu*, --- F.4th --- , 2026 WL 2452938, at *9 (D.C. Cir. 2026); *see also id.* at *10 (collecting cases from "[e]very court of appeals that has addressed this issue"). In doing so, the D.C. Circuit explained that "the Hobbs Act . . . is divisible." *Id.* at *8. Although this portion of the court's analysis focused on "the separate crimes of Hobbs Act robbery and Hobbs Act extortion," the court noted that "[t]he Hobbs Act may be further divided" because it "also creates separate offenses of Hobbs Act robbery and attempted Hobbs Act robbery." *Id.* at *8 & n.6. "[B]ecause attempts and completed offenses are distinct crimes, . . . a statute that prohibits a crime and the attempt to commit it is likely to be divisible." *Id.* at *8 n.6 (quoting *United States v. States*, 72 F.4th 778, 787 (7th Cir. 2023)). *Onyewu* is consistent with the reasoning of other courts of appeals. *See United States v. Wiley*, 78 F.4th 1355, 1364 (11th Cir. 2023); *United States v. Worthen*, 60 F.4th 10666, 1070 (7th Cir. 2023). The United States is not aware of any decision to the contrary.

*Second*, with respect to the record, although there were Vigilant database hits at a relative's house on Indigo Lane, ROA.1142, law enforcement had

separately identified that address, which was listed on Brownlee's sister's Texas identification card, ROA.145.

Respectfully submitted,

Ryan Raybould
United States Attorney

*<u>/s/ Michael Weisbuch</u>*
Michael Weisbuch
Deputy Associate Attorney General

Lauren C. Murphree
Assistant United States Attorney

cc: Matthew Wright (*via* ECF)

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 26, 2026 Decided August 21, 2026

No. 22-3063

UNITED STATES OF AMERICA,
APPELLEE

v.

ENYINNA ONYEWU, ALSO KNOWN AS REGGIE ONYEWU,
APPELLANT

Consolidated with 23-3216, 23-3217

Appeals from the United States District Court
for the District of Columbia
(No. 1:20-cr-00225-2)

*Jerry R. Smith Jr.*, *Robin M. Earnest*, *Steven M. Klepper*, all appointed by the court, argued the causes and filed the briefs for appellants.

*Thomas D. Hill*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeanine Ferris Pirro*, U.S. Attorney, and *Chrisellen R. Kolb* and *Daniel J. Lenerz*, Assistant U.S. Attorneys.

Before: HENDERSON, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* WALKER.

PER CURIAM: Enyinna Onyewu, Emmanuel Sumo and Quaysa Flumo were all convicted of robbery-related offenses after a joint trial. They now appeal their convictions, advancing numerous bases for remand, a new trial or outright acquittal. They also raise ineffective assistance of counsel claims for the first time. After considering each of their arguments, we conclude that none succeeds. Accordingly, we affirm the appellants' convictions in full.

**I. Background**

A grand jury indicted Onyewu, Sumo and Flumo in connection with the January 2018 robberies of ten commercial establishments located in the District of Columbia, Maryland and Virginia. The ten robberies involved

> (1) BP Gas Station in Silver Spring, Maryland on January 2, 2018;
>
> (2) Lucky Seven in Arlington, Virginia on January 3, 2018;
>
> (3) Lucky's Beer & Wine in Takoma Park, Maryland on January 10, 2018;
>
> (4) Delicias Market II in Washington D.C. on January 10, 2018;

> (5) El Don Restaurant in Washington D.C. on January 12, 2018;
>
> (6) Sunoco Gas Station in Washington D.C. on January 17, 2018;
>
> (7) Las Placitas Restaurant in Washington D.C. on January 22, 2018;
>
> (8) Prime Beer & Wine in Silver Spring, Maryland on January 27, 2018;
>
> (9) Sheger International Market in Silver Spring, Maryland on January 27, 2018; and
>
> (10) Exxon Gas Station in Silver Spring, Maryland on January 29, 2018.

J.A. 45–46.

The indictment principally charged the trio with conspiracy to interfere with interstate commerce by means of robbery under 18 U.S.C. § 1951, in short, conspiracy to commit "Hobbs Act robbery." Flumo and Sumo also faced two counts of completed Hobbs Act robbery and two counts of brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c) arising out of the fifth and sixth robberies.[1]

Security camera footage of the robberies depicts a consistent scheme. In all but one robbery (in one, all three men entered), two of the men entered the store while the third waited nearby. They wore ski masks, dark clothes and gloves to obscure their identities. One robber threatened employees and patrons inside the store with a handgun and the other gathered

[1] Flumo and Sumo had been indicted on three sets of these additional counts but the Government dismissed one set related to the fourth robbery at a pre-trial hearing.

cash and valuables. Although the gun was never fired, it was racked during several of the robberies.

The three also used physical force in several robberies. For example, during the robbery of a Lucky Seven convenience store—the one instance in which all three men entered—one robber hit the cashier in the face with the handgun. Meanwhile, another robber went to the back room, where he repeatedly punched and kicked the store manager whom he found there.

Following a nine-day trial, the jury found the trio guilty on all charges. The district court sentenced Onyewu to 166 months' incarceration, Flumo to 234 months and Sumo to 204 months. All timely appealed. Because the three appeals raise joint issues, they are consolidated for our review.

We have jurisdiction pursuant to 28 U.S.C. § 1291. The Court reviews the district court's evidentiary rulings for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (citing *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997)). Legal questions are reviewed de novo. *See United States v. Abou-Khatwa*, 40 F.4th 666, 674 (D.C. Cir 2022).

## II. Analysis

The three appellants challenge their convictions on several grounds and raise ineffective assistance of counsel claims for the first time. We address, and reject, each argument in turn.

### A. Evidence of Missouri Traffic Stop

In 2020, Missouri police pulled over a car for speeding. Sumo was driving the car, Onyewu was in the passenger seat

and Flumo was in the back seat.[2] Upon searching the vehicle, officers recovered "fraudulent identification cards for . . . Flumo and Sumo as well as instruments used in identity theft crimes." J.A. 153; *accord id.* at 332. All three men were arrested but the charges were eventually dropped.

Before trial on the robbery-related offenses at issue here, the Government filed a motion in limine seeking to introduce evidence of the traffic stop. The district court granted the motion over objection. It concluded the incident was relevant to show "a criminal relationship between the conspirators" and was not overly prejudicial. *Id.* at 198–99. The Missouri deputy sheriff who conducted the traffic stop and made the arrests provided testimony at trial.

All three appellants challenge the admission of the traffic stop. They allege its introduction violated Federal Rule of Evidence 404(b), which provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" Fed. R. Evid. 404(b)(1), i.e., "propensity evidence," *see United States v. Green*, 149 F.4th 733, 753 (D.C. Cir. 2025). Propensity evidence may be admitted, however, if "it has *any* purpose other than seeking to prove a criminal propensity." *Id.* at 751.

Here, the district court did not abuse its discretion in concluding the traffic stop evidence had a valid, non-propensity purpose. The joint arrest established a criminal association among Onyewu, Flumo and Sumo. *See United States v. McGill*, 815 F.3d 846, 884 (D.C. Cir. 2016) (per

---

[2] The robbery-related indictment of Onyewu, Flumo and Sumo *sub judice* had not yet been filed at this time, explaining why they were not already in custody for those offenses.

curiam) (approving the admission of evidence "for the nonpropensity purpose of proving the relationships among coconspirators"). An association is highly relevant to the charged offense of conspiracy to commit Hobbs Act robbery, which requires an agreement among two or more persons. *See United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004) ("In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators."); *see also United States v. Graham*, 83 F.3d 1466, 1473 (D.C. Cir. 1996). The appellants themselves characterize the traffic stop's "real value" as "show[ing] that all three of the defendants *collectively* were the members of the charged conspiracy." Appellants' Br. 40 (emphasis added). Because the traffic stop evidence had a valid non-propensity purpose, its admission did not violate Rule 404(b).

The appellants also argue the traffic stop is not relevant to establish a criminal association at the time of the conduct underlying their convictions because the traffic stop occurred over two years after the robberies. Relevance, however, is a low bar. *Green*, 149 F.4th at 755. If evidence has "any tendency" to make a fact "of consequence" more or less probable, it is relevant. Fed. R. Evid. 401. The existence of a relationship at one point is circumstantial, even if weak, evidence of that relationship's existence at an earlier point. *See United States v. Procopio*, 88 F.3d 21, 29 (1st Cir. 1996) ("A later criminal association increases the likelihood of an earlier one—which is all that 'relevance' requires[.]").

The appellants also argue that even if the traffic stop was admissible under Rule 404(b), Federal Rule of Evidence 403 required its exclusion. Rule 403 permits courts to exclude otherwise admissible evidence "if its probative value is substantially outweighed by a danger of" unfair prejudice. Fed.

R. Evid. 403. "A district court is accorded a wide discretion" in making evidentiary rulings, which is "particularly true with respect to Rule 403." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (citation modified).

We have no issue with the district court's exercise of discretion here. Granted, the traffic stop had limited probative value due to its date and a potential for prejudice given the involvement of other crimes. Nonetheless, it is far from clear any potential prejudice "substantially outweighed" the probative value. Fed. R. Evid. 403. For one thing, the criminal conduct uncovered during the traffic stop was nonviolent, unlike the conduct in issue at trial. *See United States v. Burwell*, 642 F.3d 1062, 1067–68 (D.C. Cir. 2011) (finding low potential for prejudice when other conduct is less violent than the defendants' charged offense), *vacated in part en banc*, No. 06-3070, 2011 U.S. App. LEXIS 20699 (D.C. Cir. Oct. 12, 2011) (mem.), *reinstated en banc*, 690 F.3d 500 (D.C. Cir. 2012). The appellants' trial counsel had the opportunity to attack the timing of the evidence on cross examination but none did so. Moreover, the jury twice heard a limiting instruction explaining proper use of the evidence. J.A. 346–47, 588–89. Overall, the district court carefully weighed the evidence and determined admission was warranted. That is enough to satisfy Rule 403. *See United States v. Gartmon*, 146 F.3d 1015, 1022 (D.C. Cir. 1998) ("As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect . . . the demands of Rule 403 have been met." (citation modified)). Accordingly, the district court did not abuse its discretion in admitting this "other acts" evidence.

**B. Evidence from Onyewu's Car**

One month after the robberies underlying the appellants' convictions, police responded to an apparently unrelated 9-1-1 call about a home invasion at 8802 36th Avenue in College Park, Maryland. The victims reported being held at gunpoint by three men who "made demands for marijuana and money." J.A. 67. The robbers fled without taking anything from the residence once police arrived. Two of the robbers were apprehended after a foot chase and were identified as Onyewu and Sumo. The third suspect escaped.[3]

Police proceeded to canvas the "streets surrounding" the invaded residence. *Id.* During the search, Detective Ken Lin discovered a blue 2008 Buick Lucerne registered to Onyewu. Police seized the vehicle and Lin then applied for a search warrant that identified the car as having been found "parked in an alley between 36th [A]venue and 37th Avenue." *Id.* However, no such alley exists. Instead, the car was parked on Crystral Springs Road, a street perpendicular to 36th Avenue. A Maryland judge approved the warrant without knowing of this error. Police searched the vehicle and uncovered, among other things, a jacket and ski mask shown to be worn by one of the perpetrators in the robbery security camera footage, multiple cell phones and a box of ammunition.

Onyewu moved to suppress all evidence found in his car as fruit of an allegedly unlawful seizure, which motion Flumo and Sumo joined. The district court denied the motion after an evidentiary hearing. Onyewu then renewed the motion to suppress and additionally requested a hearing to interrogate the veracity of Detective Lin's warrant application for the vehicle,

[3] The Government ultimately dropped the charges arising out of this home invasion.

which motion Flumo joined. The district court again denied the motion and all three appellants now challenge these denials on appeal. Because the police's seizure of the car was lawful and the mistake in the warrant application was neither material nor intentional, we reject both claims.

### *1. Probable Cause*

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "[A] warrant must generally be secured" for a search or seizure to be reasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). But there are several exceptions to the warrant requirement. One exception—the automobile exception—provides that "if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *United States v. Maynard*, 615 F.3d 544, 567 (D.C. Cir. 2010) (citation modified). If the exception applies, "[o]fficers have the option of either 'carrying out an immediate search without a warrant' or 'seizing and holding a car before presenting the probable cause issue to a magistrate.'" *United States v. Jenkins*, 984 F.3d 1038, 1041 (D.C. Cir. 2021) (quoting *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)). Here, police seized Onyewu's car before obtaining a warrant but later acquired one before conducting a search. The district court held that the automobile exception justified the car's seizure. The appellants now advance two theories to undermine the exception's application.

First, they argue that Onyewu's car was not mobile at the time of its seizure.[4] In particular, they note that two of the

---

[4] This argument was not made in the district court and, thus, it is subject to plain error review. Fed. R. Crim. P. 52(b); *Greer v. United States*, 593 U.S. 503, 507 (2021).

home invasion suspects were in custody and could not access the vehicle. But this argument ignores the fact that the third suspect remained at large. Regardless, a car need not be "immediately mobile" to fall within the automobile exception. *California v. Carney*, 471 U.S. 386, 391 (1985). Mobility is inherent in all operable vehicles. *See United States v. Williams*, 773 F.3d 98, 105–06 (D.C. Cir. 2014) ("All that is required for an automobile to be readily mobile within the meaning of the automobile exception is that it is used on the highways, or is readily capable of such use." (citation modified)); *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007) ("The mere inherent mobility of the vehicle is sufficient to constitute the 'ready mobility' the automobile exception [re]cognizes."). Thus, the mobility of the car does not turn on the appellants' access to it.

Second, and principally, the appellants argue police lacked probable cause to seize and search the car. We determine the existence of probable cause de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Our analysis requires determining whether police had probable cause to believe the car contained "contraband or evidence of a crime" at the time they discovered it, *Florida v. Harris*, 568 U.S. 237, 243 (2013), notwithstanding their decision to obtain a warrant before conducting the search, *see Jenkins*, 984 F.3d at 1041.[5]

We conclude that police had probable cause to seize Onyewu's vehicle. "The test for probable cause is not reducible to precise definition or quantification," *Harris*, 568 U.S. at 243 (citation modified), and courts instead look to the "totality of the circumstances," *id*. at 244. Here, the

[5] The appellants challenge the seizure of the vehicle as violative of the Fourth Amendment and any evidence discovered during the subsequent search as so-called "fruit of the poisonous tree."

combination of the car's proximity to the home invasion and its registration to an apprehended suspect suffice to meet this standard. There need not be "certainty that contraband or evidence of a crime will be found—only a 'fair probability.'" *United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). We think it is fairly probable that such evidence will be found in a suspect's car when it is parked near the scene of the crime.

The appellants also assert that, because Sumo and Onyewu were unsuccessful in taking anything from the residence and were quickly apprehended, they could not have stashed any contraband in the car. This argument again ignores the fact that the third suspect remained at large. It also too narrowly characterizes what can establish probable cause. As Detective Lin noted in the warrant application, robbers often leave instrumentalities of crime—including weapons or identification—in their vehicles. And a likelihood of finding such instrumentalities is enough for probable cause. *See United States v. Lawson*, 410 F.3d 735, 740–41 (D.C. Cir. 2005).

### *2.* **Franks** ***Hearing***

The appellants further argue that the mistaken description of the car's location in Detective Lin's affidavit invalidated the corresponding search warrant. As noted *supra*, the affidavit described Onyewu's car as "parked in an alley between 36th [A]venue and 37th Avenue," J.A. 67, although no such alley exists and the car was in fact parked on Crystal Springs Road They assert the district court erroneously denied their request for an evidentiary hearing (a *Franks* hearing) on the matter. We disagree.

This Court has not resolved which standard applies when reviewing the denial of a *Franks* hearing and our sister circuits

are split on the issue. *Maynard*, 615 F.3d at 551; *see United States v. Dale*, 991 F.2d 819, 843 n.44 (D.C. Cir. 1993) (per curiam) (collecting cases). We need not decide the matter in this case as the claim fails under either de novo or clear error review. *See United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010).

There is usually a "presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). An evidentiary hearing into the warrant's veracity, known as a *Franks* hearing, will not be granted unless the challenger makes "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* Moreover, if there is sufficient evidence to support probable cause without the disputed material, no hearing is required. *Id.* at 171–72.

Because Lin's misrepresentation was neither material nor intentional, a *Franks* hearing was not necessary. Although the proximity of Onyewu's car to the home invasion was crucial, the precise location of the car is immaterial for probable cause. The warrant affidavit adequately established that Onyewu's car was nearby, even without using that precise word. It noted the car was discovered during a canvas of "the streets surrounding 8802 36th Avenue, College Park, Prince George's County, Maryland." J.A. 67. "Surrounding" implies proximity. *See Surround*, Oxford Eng. Dictionary, https://www.oed.com/dictionary/surround_v?tab=meaning_and_use [https://perma.cc/SK94-EMZN] (last visited June 5, 2026) ("To enclose, encompass, or beset on all sides[.]"). As noted *supra*, this location together with the car's registration to Onyewu was enough to support probable cause. *See* Transcript of Oral Arg. at 57 (appellants' counsel conceding that the

warrant application would have supported probable cause if the location were accurate).

Moreover, there is no evidence that Detective Lin deliberately misrepresented the car's location. Although the appellants allege Lin lied about the car's location to justify seizure of the car under local towing regulations, this is sheer speculation. The affidavit made no mention of any such regulations and instead focused entirely on the nearby home invasion as the basis of probable cause. Also, Detective Lin explained that he tried to identify the street when he initially found the car but was unable to do so because he could not see any street signs and was unable to find any street name on the map on his phone. Thus, it appears the address included was "believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165. That is not the type of deliberate misstatement or "reckless disregard for the truth" that a *Franks* hearing aims to address. *Id.* at 155.

### C. Whether Hobbs Act Robbery is a "Crime of Violence"

Appellants Flumo and Sumo then argue that the district court erred in not dismissing the § 924(c) counts against them because Hobbs Act robbery does not qualify as a predicate "crime of violence." We disagree. Under 18 U.S.C. § 924(c), criminal defendants who are convicted of a "crime of violence" receive a mandatory-minimum sentencing enhancement of five years. That mandatory-minimum sentencing enhancement applies to Hobbs Act robbery.

#### *1. The Modified Categorical Approach*

To determine whether a crime is a "crime of violence," one must determine whether to apply the categorical approach or the modified categorical approach. So we start by explaining those two approaches.

First some background. Some statutes, like § 924(c), prescribe punishment based on the defendant's commission of an underlying crime, or "predicate offense." For example, § 924(c) adds a five-year minimum enhancement to the sentence of any defendant who has committed a "crime of violence," which is defined as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A). Thus, to apply that five-year minimum enhancement, the underlying crime the defendant committed—his predicate offense—must have had "as an element" the actual, attempted, or threatened use of force.

Elements are necessary features of crimes. *See Mathis v. United States*, 579 U.S. 500, 504 (2016). So to qualify as a "crime of violence," the predicate offense must necessarily, or "always[,] require[] the [G]overnment to prove . . . the use, attempted use, or threatened use of force." *United States v. Taylor*, 596 U.S. 845, 850 (2022). Otherwise, the actual, attempted, or threatened use of force would not be an element, or necessary feature, of the predicate offense. Or to use the Supreme Court's language, the predicate offense must *categorically* involve the actual, attempted, or threatened use of force. *Id.*

That, in a nutshell, is the categorical approach. But notice the upshot of this focus on the elements of the offense. "[T]he defendant's actual conduct" does not matter. *Mathis*, 579 U.S. at 504. So suppose a defendant bludgeons someone to death. An ordinary speaker of English would likely say the defendant committed a "crime of violence." But the defendant might not have done so as § 924(c) uses that term. It would depend on the elements of the crime of which the defendant is convicted. Only when one knows the elements of the crime of conviction can one determine whether that crime necessarily, or

categorically, involves the actual, attempted, or threatened use of force so as to qualify as a "crime of violence."

The logic of the categorical approach naturally gives rise to another approach: the modified categorical approach. The modified categorical approach rests on a basic reality. Sometimes, a single statute provides two alternative elements, thereby creating two separate crimes. *Mathis*, 579 U.S. at 505. In that case, courts applying the categorical approach must figure out which of the two separate crimes the defendant has committed in order to apply the categorical approach to that particular crime. *See id.* at 506.

One must be careful, though, in determining whether a statute creates alternative elements, and therefore multiple crimes, or merely spells out "various factual means of committing a single" crime. *Id.* For example, a statute that proscribes "murder, including with a gun, knife, bat, or other dangerous object" should probably not be divided into separate crimes of gun murder, knife murder, bat murder, and other-dangerous-object murder. *See id.* (discussing a similar example). Instead, the statute is better thought of as spelling out various factual means for committing a single offense: murder. (Because that statute cannot be so divided, courts call it "indivisible.")

Moreover, to convict under that indivisible statute, "a jury need not find (or a defendant admit) any particular item: A jury could convict even if some jurors 'conclude[d] that the defendant used a knife' while others 'conclude[d] he used a gun[.]'" *Id.* (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999)). On the other hand, a statute that proscribes "'the lawful entry or the unlawful entry' of a premises with the intent to steal," and provides for greater punishment if the entry were unlawful, should probably be divided into "two different

offenses." *Id.* at 505. (Because that statute can be so divided, courts term it "divisible.") To convict under that divisible statute, every juror would need to agree either that the entry was unlawful or that it was lawful. *See Ramos v. Louisiana*, 590 U.S. 83, 90 (2020) ("A jury must reach a unanimous verdict in order to convict" consistent with the Constitution).

Whether a statute is divisible makes a difference for purposes of the categorical approach. To see why, consider an example. Imagine a defendant points a gun at his landlord while taking the landlord's crystal statue of a horse's head. The defendant is then convicted under a statute that proscribes "taking another's property under threat of violence or slander." If that statute is divisible—i.e., if "threat of violence" and "threat of slander" are understood as alternative elements of separate crimes—the defendant presumably committed a "crime of violence" under § 924(c). He committed the crime of "taking another's property under threat of violence," and that would seem to have "as an element the . . . threatened use of physical force." *See* 18 U.S.C. § 924(c)(3) (so defining "crime of violence" under § 924(c)). But if the statute is indivisible—i.e., "threat of violence" and "threat of slander" are different factual means of committing a single crime—the defendant probably did not commit a "crime of violence." A hypothetical defendant could commit that crime by taking his landlord's horse-head statue while threatening to lie to the other tenants that the landlord spends his weekends at the racetrack gambling away the tenants' security deposits. Spewing that sort of malicious falsehood, of course, would not appear to involve the actual, attempted, or threatened use of force. So the crime the defendant committed would not qualify as a "crime of violence" under § 924(c).

### *2. The Modified Categorical Approach as Applied to Hobbs Act Robbery*

Because it can be difficult to determine when a statute provides different factual means of committing a single crime (i.e., is indivisible) instead of different elements of different crimes (i.e., is divisible), courts have developed tools for drawing the distinction.

Some tools are textual. For example, if the statute "itself identif[ies] which things must be charged," those things are elements. *Mathis*, 579 U.S. at 518. But if the statute identifies which things "need not be" charged, those things are means. *Id.* Additionally, when "statutory alternatives carry different punishments," the alternatives are elements, whereas when "a statutory list is drafted to offer 'illustrative examples,'" the examples are factual means for committing a single offense. *Id.* (quoting *United States v. Howard*, 742 F.3d 1334, 1348 (11th Cir. 2014)).

Sometimes, textual clues alone leave something to be desired. In that case, courts may look to the record of prior conviction to help determine whether the statutory alternatives are separate elements of separate crimes or various means to commit a single crime. *See id.*

#### **a. <u>Hobbs Act Robbery Is a Divisible Offense</u>**

The statute at issue in this case, the Hobbs Act, is divisible. It may be divided into the separate crimes of Hobbs Act robbery and Hobbs Act extortion.[6] Thus, the modified categorical approach applies.

---

[6] The Hobbs Act may be further divided. For instance, the Hobbs Act also creates separate offenses of Hobbs Act robbery and

We begin with the text of the statute. The Hobbs Act imposes criminal penalties on "[w]hoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do." 18 U.S.C § 1951(a).

The text suggests robbery and extortion are separate elements of separate crimes. The Hobbs Act offers separate legal definitions for robbery and extortion, listing a series of requirements for a crime to qualify as "robbery" and different requirements for a crime to qualify as "extortion." *Compare id.* § 1951(b)(1) (defining "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury"), *with* § 1951(b)(2) (defining "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"). Moreover, those legal definitions come in two distinct paragraphs. *See id.* § 1951(b)(1) ("robbery"), (b)(2) ("extortion"). That reaffirms that robbery and extortion are not just separate factual means to commit a single crime. Instead, "robbery" and "extortion" are different legal elements of different crimes.

The text is also reaffirmed by other tools of analysis. For instance, the jury instructions labeled one of the Hobbs Act offenses as "Interference with Interstate Commerce by Robbery." J.A. 594. The jury was instructed to determine whether each defendant took money or property "by robbery."

---

attempted Hobbs Act robbery. *See Taylor*, 596 U.S. at 851 (distinguishing the two); *see also United States v. States*, 72 F.4th 778, 787 (7th Cir. 2023) ("[B]ecause attempts and completed offenses are distinct crimes, . . . a statute that prohibits a crime and the attempt to commit it is likely to be divisible[.]").

*Id.* No other "means" were listed in the alternative. So to convict, the jury had to find the defendant committed "robbery."

The separate instruction for the crime of "Conspiracy to Interfere with Interstate Commerce by Robbery" is of a piece. It required the jury to find that there was an *agreement* to commit robbery. *Id.* at 592. It did not instruct the jury that the defendant could be convicted of conspiracy if some jurors found he had committed conspiracy to rob and others found he committed conspiracy to extort.

Our reading of the Hobbs Act accords with precedent. "[C]ourts across the country . . . have long held that Hobbs Act robbery and Hobbs Act extortion are separate and distinct crimes[.]" *United States v. Armstrong*, 122 F.4th 1278, 1287 (11th Cir. 2024) (collecting cases). Moreover, the Supreme Court itself has referred to "the substantive offense of Hobbs Act extortion," *Ocasio v. United States*, 578 U.S. 282, 292 (2016), in addition to the separate offense of "Hobbs Act robbery," *Taylor*, 596 U.S. at 848.

**b. *Burwell* Is Not to the Contrary**

In *United States v. Burwell*, our court interpreted 18 U.S.C. § 2113(a), which generally "criminalizes bank robbery completed 'by force and violence, or by intimidation,' or 'by extortion.'" 122 F.4th 984, 986 (D.C. Cir. 2024) (quoting 18 U.S.C. § 2113(a)). The question presented was whether extortion was a separate factual means for committing federal bank robbery or whether extortion was an alternative element of a separate crime. *Burwell* concluded that extortion was a separate factual means for committing the single crime of federal bank robbery.

*Burwell*'s logic depended in part on the fact that within the subsection criminalizing federal bank robbery, Congress had provided a paragraph break. In the first paragraph, Congress had proscribed federal bank robbery. In the second paragraph, Congress had proscribed federal bank burglary. From that, *Burwell* reasoned that if Congress wanted to create separate crimes, it knew to use separate paragraphs. *See Burwell*, 122 F.4th at 990; *cf. United States v. Butler*, 949 F.3d 230, 235 (5th Cir. 2020) ("a paragraph break often signals that a new idea is coming," thus it is "logical to conclude that a paragraph break in a statute signals a new offense"). Thus, according to *Burwell*, "force and violence," "intimidation," and "extortion"—all contained within the same paragraph—had to be separate factual means to commit the singular crime of federal bank robbery. *Burwell*, 122 F.4th at 990.

Here, though, the relevant subsection of the Hobbs Act contains a single paragraph. There is no separate paragraph denoting a separate crime from which one can infer Congressional intent to create separate crimes for extortion and robbery.

Indeed, if anything, *Burwell*'s reasoning bolsters our holding that the Hobbs Act makes extortion and robbery separate elements of separate crimes. *Burwell* said that paragraph divisions within a statute may mark different crimes. The Hobbs Act divides robbery and extortion, placing them in distinct paragraphs. Thus, *Burwell* reinforces that the Hobbs Act makes robbery and extortion different crimes.

### *3. Hobbs Act Robbery Is a Crime of Violence*

Hobbs Act robbery is a "crime of violence" under § 924(c). Assuming Hobbs Act robbery is not further divisible, it requires "an unlawful taking . . . of personal property" against an individual's "will, by means of actual or threatened

force, or violence, or fear of injury . . . to his person or property." 18 U.S.C. § 1951(b)(1). Regardless of whether the robbery is committed by force, violence, or fear of injury, it necessarily requires the "use, attempted use, or threatened use of physical force." *Id.* § 924(c)(3)(A).

Even presuming § 924(c) requires "*violent* force," *Johnson v. United States*, 559 U.S. 133, 140 (2010) (so interpreting § 924(e)(2)(B)(i)'s similar language), a robbery committed by "force" or "violence" naturally involves violent force. In the context of a robbery statute like the Hobbs Act, terms like "force" or "violence" typically refer to physical force. *See Delligatti v. United States*, 604 U.S. 423, 431 (2025). So the only question in § 1951(b)(1)—which requires force, violence, or fear of injury—is whether "fear of injury" involves "violent force."

It does. The "fear of injury" prong, whether to one's "person or property," does not appear in isolation. 18 U.S.C. § 1951(b)(1). It is preceded by the terms "force" and "violence," both of which are inherently physical. *See Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977) (counseling that several "words grouped in a list should be given related meaning"); *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[A] word is known by the company it keeps[.]"). In that context, the term "fear of injury" is best understood to mean "fear of *physical* injury," i.e., the "violent force" contemplated by 18 U.S.C. § 924(c). *See Johnson*, 559 U.S. at 140.

Yet again, we are not alone in our understanding of the statute. Every court of appeals that has addressed this issue has reached the same conclusion: Hobbs Act robbery is a crime of violence. *See United States v. García-Ortiz*, 904 F.3d 102, 107–09 (1st Cir. 2018); *United States v. Hill*, 890 F.3d 51, 60

(2d Cir. 2018); *United States v. Stoney*, 62 F.4th 108, 114 (3d Cir. 2023); *United States v. Mathis*, 932 F.3d 242, 266 (4th Cir. 2019); *United States v. Buck*, 847 F.3d 267, 275 (5th Cir. 2017); *United States v. Gooch*, 850 F.3d 285, 291–92 (6th Cir. 2017); *United States v. Fox*, 878 F.3d 574, 579 (7th Cir. 2017); *United States v. Jones*, 919 F.3d 1064, 1072 (8th Cir. 2019); *United States v. Eckford*, 77 F.4th 1228, 1236–37 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 521 (2023), *overruled on other grounds by United States v. Gomez*, 165 F.4th 1199 (9th Cir. 2026); *United States v. Melgar-Cabrera*, 892 F.3d 1053, 1066 (10th Cir. 2018); *United States v. Wiley*, 78 F.4th 1355, 1363–64 (11th Cir. 2023); *see Armstrong*, 122 F.4th at 1287–88 (11th Cir. 2024). Today, we join our sister circuits in that conclusion.

**D. Onyewu's Due Process Claim**

Onyewu individually advances an argument that the Government deprived him of due process when it wired his plea offer to his co-defendants' offers. We hold that it did not. When the Government wires a plea offer—i.e., conditions one defendant's plea offer on other defendants' acceptance of their respective plea offers—it "does not, *per se*, offend due process." *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992). So long as "the government had probable cause to arrest and prosecute" all the "defendants in a related crime," and the Government did not "conduct[] itself in bad faith . . . to generate additional leverage over the defendant," the "wired plea is constitutional." *Id.* at 1021. Under that test, the wiring of Onyewu's plea was constitutional.

Onyewu does not argue there was no probable cause nor that the crimes were unrelated. He argues only that the Government acted "in bad faith . . . to generate additional leverage over" him. *Id.* That fails.

Onyewu has not proven that the Government made a bad-faith attempt to assert additional leverage over him. Indeed, nothing Onyewu has asserted shows "improper . . . pressure to force him to plead guilty." *Id.* at 1020; *see also id.* at 1021 ("The question, of course, is whether the practice of plea wiring is so coercive as to risk inducing false guilty pleas."). On the contrary, the more likely explanation for the Government's wiring of the plea deal was efficiency. The goal was that either all three defendants would enter plea deals, or the Government would just take all three to trial. *See United States v. Williams*, 827 F.3d 1134, 1165 (D.C. Cir. 2016) (finding that the Government's preference to either accept guilty pleas from both defendants or trying both "provides no basis to conclude that the Government's offer was coercive or made in bad faith"). Moreover, it is somewhat challenging to find coercion on this record given that Onyewu did not even accept the plea offer. *Cf. Pollard,* 959 F.2d at 1021 ("To say that a practice is 'coercive' or renders a plea 'involuntary' means only that it creates improper pressure that would be likely to overbear the will of some innocent persons and cause them to plead guilty.").

Consider Onyewu's main argument.[7] Onyewu argues the plea deal was too onerous for Flumo given the "severe immigration consequences" it would impose. Appellants' Br. 120. Thus, Onyewu argues, he was guaranteed to face trial, and as a result, he was sentenced to 166 months incarceration, well above the forty-six–month maximum his plea offer

[7] Onyewu also suggests the Government used his young age and his relative inexperience in the criminal process against him. *See* Appellants' Br. 119; Reply Br. 67. But he offers no evidence of that, nor any reason to think it used his age and inexperience to coerce him into pleading guilty.

contemplated. Even if we were to credit Onyewu's allegation,[8] his complaint boils down to the fact that the Government did not offer him a plea deal he could end up accepting: Per Onyewu, Flumo was guaranteed to reject the plea offer, thereby nullifying Onyewu's own deal. *See* Reply Br. 4. But Onyewu had "'no right to be offered a plea' at all, much less the particular plea of his choosing." *Williams*, 827 F.3d at 1165 (quoting *Missouri v. Frye*, 566 U.S. 134, 148 (2012)).

If anything, Onyewu's argument would seem to cut against his position. At worst, the Government threatened to impose an onerous condition on Flumo if Onyewu *accepted* the plea deal. Perhaps, that could impose some pressure on Onyewu to reject the deal. *Cf. Pollard*, 959 F.2d at 1021 (noting that a defendant might feel pressure to avoid an onerous condition upon "a loved one, particularly a spouse" while still holding such pressure did not amount to coercion). But the question for coercion is whether the Government improperly pressured Onyewu to plead guilty, not whether Onyewu might have felt some pressure to refuse to plead guilty. *See id.* ("The question, of course, is whether the practice of plea wiring is so coercive as to risk inducing false guilty pleas.").

**E. Flumo's Individual Claims**

Flumo appeals a number of issues independently of his co-defendants. We consider—and reject—each of them below,

---

[8] We would hesitate to do so. Onyewu does not offer any evidence that Flumo placed much weight on any immigration consequences involved in accepting the deal. Moreover, one doubts immigration consequences would bear much weight in Flumo's decision given the potential eighteen-year sentence under the plea offer. *Compare Lee v. United States*, 582 U.S. 357, 371 (2017) ("deportation [was] the 'determinative issue' for an individual in plea discussions" when he risked only "a year or two more of prison time").

and ultimately decline to vacate Flumo's convictions on those grounds raised.

### *1. Admission of All Evidence from Flumo's Cell Phone*

As described in Part II.B, law enforcement officers seized Onyewu's vehicle and subsequently searched it pursuant to a warrant. During that search, Detective Lin recovered three cell phones—a pink Apple iPhone 6s Plus, a gold Apple iPhone 6s, as well as a silver Samsung Galaxy S7 Edge that was later linked to Flumo. To determine the phone number associated with the Samsung device, Detective Lin used the cell phone's emergency call feature, dialed 9-1-1 from the lock screen, and then asked the 9-1-1 dispatcher to relay to him the "telephone number on the other side." J.A. 236–37. Detective Lin then included the cell phone number provided by the dispatcher, the IMEI number (a number identifying the physical device), as well as a general description of the Samsung phone in the search warrant affidavit for the device, which was signed on February 20, 2018. Pursuant to the search warrant, Agent Kaori Tahan of the FBI conducted a partial extraction of the Samsung device, and the Government admitted six photographs obtained from that extraction through Agent Tahan's testimony at trial.

Flumo argued in the proceeding below that the Detective's decision to dial emergency services from the lock screen of Flumo's phone constituted an unlawful search under the Fourth Amendment. Asserting that no exception would apply to the default rule of exclusion, Flumo further argued that any evidence from the phone—including all six admitted photographs—should have been suppressed because the "later-obtained warrant for the phone was tainted by the evidence Detective Lin illegally obtained from it." Appellants' Br. 33, 92; *see also Wong Sun v. United States*, 371 U.S. 471 (1963)

(establishing that evidence obtained in violation of the Fourth Amendment must be suppressed absent exception). The district court disagreed with Flumo, first finding that Detective Lin's call to emergency services did not constitute a Fourth Amendment search, and second, that even if it did, the good-faith exception—which allows the admission of unlawfully seized evidence so long as the officer reasonably believed that the affidavit established probable cause—applied.

We review "a district court's legal rulings on a suppression motion *de novo* . . . and its factual findings for clear error." *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007). Although the question of whether Detective Lin's dialing of 9-1-1 from Flumo's phone constituted a search under the Fourth Amendment is a complex—and novel—one, we need not reach it. Even assuming that the call constituted a Fourth Amendment search for which Detective Lin should have obtained a warrant, the inevitable discovery exception to the exclusionary rule clearly applies here and obviates the need to suppress the evidence.

The inevitable discovery exception to the exclusionary rule permits the admission of seemingly unlawfully obtained evidence if the Government can establish by "a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Here, as the district court found, the phone number associated with the Samsung device was "not a material element of the warrant" and thus, "not required to secure" it. J.A. 288. Further, while Detective Lin testified that when initially drafting the affidavit, he believed that "it was necessary to have some sort of telephone number," he later learned that it was not required so long "as you describe the phone really well with a photograph attachment." *Id*. at 246. And Agent Tahan, who conducted an extraction of the

Samsung device, indicated that the phone number was not necessary for her to be able to extract the data from the phone. *Id*. at 438–39. The above thus leads to the conclusion that if one were to excise the phone number from the affidavit, the warrant would still have been granted, the phone number still inevitably discovered, and the Samsung device itself still inevitably searched.

Flumo contests the district court's conclusion by arguing that without the phone number, the warrant would have been deficient because it lacked the particularity required under the Fourth Amendment. This too we find unavailing. The Fourth Amendment requires that a warrant must "particularly describe the place to be searched" so that the "officer will not mistakenly search the wrong place." *United States v. Scurry*, 821 F.3d 1, 15 (D.C. Cir. 2016) (citation modified). Here, the search warrant not only contained a precise description of the phone, detailing the color, but it also underscored that the device was a "Samsung Galaxy S7 Edge," which was notably distinct from the other devices recovered from the vehicle. J.A. 204. Even without the phone number in the affidavit, there cannot be any reasonable risk that the officer would mistakenly have searched an entirely different phone upon the warrant being granted.

In sum, although we decline to opine on whether the 9-1-1 call, dialed to determine the number connected to the Samsung device, constituted an unlawful search for which the Detective should have obtained a warrant, we hold that the evidence obtained from the phone would have been inevitably discovered because the phone number itself was ultimately immaterial to whether the search warrant would have been granted. Flumo's first argument thus fails.

### *2. Admission of a Photograph of Flumo Holding a Handgun*

In addition to moving to suppress all evidence from his phone, Flumo also moved to exclude a specific photograph extracted from his mobile device of him holding a handgun. Flumo argued to the district court that the photograph was improper propensity evidence under Federal Rule of Evidence 404(b) and prejudicial under Rule 403. The district court denied Flumo's motion and admitted the photograph, finding that although the photograph was extrinsic to the charged conspiracy, and thus, subject to Rule 404(b), it was still admissible to establish Flumo's "opportunity to have access to a firearm" and his "identity." J.A. 323. Under Rule 403, the district court found that although it was "hard . . . to make out" what the photo was depicting, *see id.* at 314, and that there was "obviously . . . prejudicial value," such value was "certainly not substantially outweighed by the probative value of the evidence," *id*. at 324. As noted in Part II.A, we review the district court's decision to admit evidence under Rule 403 and 404(b) for an abuse of discretion and are "extremely wary of second-guessing the legitimate balancing of interests taken by the trial judge in this context." *McGill*, 815 F.3d at 932–33 (citation modified); *United States v. Sheffield*, 832 F.3d 296, 307 (D.C. Cir. 2016).

We decline to disturb the balancing of those interests here. Flumo's main argument on appeal is that "opportunity to access firearms was irrelevant" because he "was not the gunman in any of the robberies, and there was no evidence that [he] supplied a gun to either of his codefendants." Appellants' Br. 96. But Flumo was charged with aiding and abetting the use of a firearm. The photograph of Flumo holding the gun could thus demonstrate not that Flumo was "predisposed to possessing firearms," *see id.* at 97, but instead that Flumo had

access to guns and that he could have supplied the use of the gun during the robberies, even if he was not the individual who ultimately wielded it, *accord United States v. Lauria*, 541 F. Supp. 3d 311, 314, 317–18 (S.D.N.Y. 2021) (finding that evidence of photos and videos demonstrating that defendant possessed a gun was admissible to establish that defendant had opportunity and access firearms, even when defendant only served as the getaway driver).

Flumo also contests the district court's finding that the photo could be admitted because it would "show his identity." Appellants' Br. 96. Flumo's argument is mainly premised on the fact that the "photograph was 'hard' to interpret" and that the object in the photograph "could not be identified as the firearm allegedly used in the robberies." *Id.* at 96–97 (quoting J.A. 314). Accordingly, the photograph could not have been admitted for the purpose of identifying Flumo as one of the robbers. But the District Court acknowledged that the picture was hard to discern and that the evidence was a "little weaker on identity." J.A. 323. Yet it still found that the photo could be admitted because it provided probative value as to "whether [the defendants] were the ones who committed these offenses." *Id*. at 324 Such acknowledgment of the varying factors, as well as the "legitimate balancing" of those factors demonstrates that the district court did not abuse its discretion in admitting the photograph for purposes of showing identity under Rule 404(b). *McGill*, 815 F.3d at 932–33 (citation modified)

The same goes for Flumo's argument that the district court should not have admitted the photo under Rule 403 because any probative value of the evidence was substantially outweighed by the risk of prejudice. Flumo would have us believe that the photograph had no probative value at all, but as explained above, this is patently untrue. The district court properly recognized both the prejudicial weight of the evidence, as well as its probative value, and carefully balanced those interests.

Additionally, the district court also issued a limiting instruction immediately after the testimony admitting the photograph. It instructed the jury to only use the evidence "for the limited purpose of evaluating whether [Flumo was] one of the persons who committed the crimes charged in" the case, and prohibited them from using the "evidence for any other purpose," such as "conclud[ing] that [Flumo] has a bad character or has a criminal personality." J.A. 457–58. When a district court "instruct[s] the jury that it was only to consider the evidence for the limited and proper purpose[] . . . . This is the type of instruction that can sufficiently protect a defendant's interest in being free from undue prejudice." *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (citation modified). The district court's limiting instruction here thus further weighs in favor of affirming its ruling, and we hold that the district court did not abuse its discretion in rejecting Flumo's Rule 403 arguments.

### *3. Testimony Regarding the Handgun Depicted in the Photograph*

Recall that the Government admitted six photographs extracted from Flumo's phone through FBI Agent Tahan, including the photograph of Flumo holding a gun. During her direct examination, Agent Tahan was asked to opine on this photo, with the Government first asking whether she was "familiar with firearms." J.A. 451. This drew a general objection from the defense, which the district court overruled. Agent Tahan responded that she was familiar with firearms and that the gun "depicted in the picture appear[ed] to be consistent with firearms that are real." *Id.* at 451–52. The district court then called for a bench conference, noting that this was a "lay opinion issue," and that at that point in the testimony, the Government needed to lay "a little bit more foundation." *Id.* at 452. Once trial resumed, the Government did so, and asked Agent Tahan "how many times . . . [she] encountered

firearms," to which Agent Tahan responded, "[a] couple hundred times." *Id.* at 453. When asked to explain how the photograph of the gun was "consistent with a functional real gun," Agent Tahan noted that "toy guns or the training guns that [the FBI] use[d] would have an orange tip on the very front of the barrel," which was missing from the gun in the photograph. *Id.* at 454. Agent Tahan further testified that the metallic-looking texture of the gun in the photograph, as well as the visible magazine, also contributed to her conclusion that the gun was consistent with a real firearm. *Id.* at 454–55. After Agent Tahan completed her direct examination, the district court found that "foundation was laid" for Agent Tahan's testimony of whether "the image in the photograph [was] consistent with a real weapon," highlighting that the testimony only "bolster[ed] the nature of the lay testimony." *Id.* at 456–57. The defense noted that they were "continuing the objection." *Id.* at 457. At no point was Agent Tahan ever qualified as an expert.

Flumo argues on appeal that the district court impermissibly admitted Agent Tahan's testimony as lay opinion testimony in violation of Federal Rule of Evidence 701, which mandates that such testimony should not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). The force of Flumo's argument is premised on his assertion that because Agent Tahan relied on her previous professional experience with guns in her testimony, she could have only been properly admitted as an expert witness under Rule 702. The Government disagrees, arguing that because the basis of Agent Tahan's testimony arose from her "common, but not universal" experience with guns, *see* Appellee Br. 93, Agent Tahan's testimony was properly admitted as lay opinion testimony. Although we agree that the district court erred in admitting

Agent Tahan's testimony as lay opinion rather than expert,[9] we hold that the error was ultimately harmless.

While Rule 701 governs the admission of lay opinion testimony, Rule 702 governs the admission of expert opinion testimony. The distinction between the two is important because of the reliability requirements set forth in Rule 702 that do not exist in Rule 701. Indeed, Rule 702 requires that an expert witness be qualified "by knowledge, skill, experience, training, or education," with the judge playing a "gatekeeping" role in ensuring that such testimony will help the "trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." *Daubert*

[9] The parties contest what standard of review properly applies. The Government argues that this Court should review for plain error because Flumo's challenge was unpreserved, as Flumo only provided a general objection to Agent Tahan's testimony. *See* Appellee Br. 90 (citing *United States v. Guerrero*, 665 F.3d 1305, 1309 (D.C. Cir. 2011)). The Government further contends that the question of whether the objection was properly preserved also impacts the harmless error analysis. According to the Government, when an error is preserved, "the government must show that the error did not have 'substantial and prejudicial effect,'" *see* Appellee Br. 94 (quoting *United States Bostick*, 791 F.3d 127, 147 (D.C. Cir. 2015), and when the error is unpreserved, the defendant "must show that 'the error effected his substantial rights.'" *Id.* (quoting *Guerrero*, 665 F.3d at 1309); *see also* Fed. R. Crim. P. 52. In contrast, Flumo asserts that we should review for abuse of discretion because it was "abundantly clear that the district court understood that [Flumo's] counsel objected to Agent Tahan's testimony because it was improper 'lay opinion testimony.'" Reply Br. 56; *see also United States v. Pole* 741 F.3d 120, 124 (D.C. Cir. 2013). Ultimately, there is no need to decide what standard of review should apply because Flumo's arguments would fail under either standard.

*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *accord* Fed. R. Evid. 702. There are no such admission requirements for lay opinion testimony. Additionally, lay opinion testimony does not require the same disclosures as required for expert testimony. *See, e.g.,* Fed. R. Evid. 705. The rules committee was keenly aware of these distinctions, and the heightened burden imposed on expert testimony, and the committee amended the evidence rules in 2000 to "eliminate the risk that the reliability [and disclosure] requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's notes to 2000 amendment.

The line between lay opinion and expert testimony can sometimes be far from bright. However, one illuminating distinction is that lay opinion testimony "results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Id*. (citation modified). Further to this point, this Court has expressly held that "knowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (citation modified).

In light of the above guidance, it is clear that Agent Tahan's testimony falls within the purview of expert, rather than lay opinion. The Government would have us decide that Agent Tahan's testimony, which it claims was grounded in "common, but not universal" experiences with guns, is of the type that is from a "process of reasoning familiar in everyday life." Appellee Br. at 89, 93 (citation omitted). But Agent Tahan's testimony was grounded in her experience not as a lay citizen, but as both a police officer and an FBI agent, because she compared the gun in the photograph to the "toy and training

guns" used in her profession to explain her conclusion that the photographed gun was consistent with a "real functioning gun." J.A. 454–55. Such testimony is clearly within the realm of an individual who is a "specialist[] in the field," *see* Fed. R. Evid. 701 advisory committee's notes to 2000 amendment, and further, "derived from previous professional experience," *Smith*, 640 F.3d at 365. Accordingly, the district court erred in admitting Agent Tahan's testimony under Rule 701.

That said, we further hold that the district court's error is harmless because it is clear that it could not have "a substantial and injurious effect on the jury's verdict." *McGill*, 815 F.3d at 880 (citations omitted). Flumo raises two arguments contesting this: (1) "[T]here was no direct evidence of [his] involvement in the robberies"; and (2) "Agent Tahan was the only witness who linked [him] to a firearm at any point in time." Appellants' Br. 104–05. Both arguments are unpersuasive.

The record clearly belies Flumo's assertions. While Flumo is right that there was no "direct evidence" of his involvement in the robberies, there was a plethora of circumstantial evidence that connected him to the scene of the crimes. *See United States v. Gates*, 807 F.2d 1075, 1080 (D.C. Cir. 1986) ("As a general rule, circumstantial evidence is as pertinent as direct evidence to the establishment of guilt or innocence in a criminal case." (citations omitted)). This included cell phone location evidence that placed Flumo near the scene of the robbery at the BP Gas station that occurred on January 2, 2018, near the El Don Restaurant that occurred on January 12, 2018, near the Sunoco Gas station on January 17, 2018, as well as near four additional robbery locations. Other evidence included Flumo's arm tattoo that was partly visible during multiple robberies, including the El Don robbery. And further supporting evidence involved a recorded jail call, wherein

Flumo instructed his co-defendant, Sumo, to trash an orange-and-black jacket, which matched the clothing that Flumo presumably wore to three robberies. Such evidence clearly demonstrates that there was circumstantial evidence of Flumo's involvement in the robberies, such that Agent Tahan's testimony, if wrongly admitted, would not have affected his "substantial rights." Fed. R. Crim. P. 52(a).

Similarly, Flumo is incorrect that Agent Tahan's testimony was the only evidence that established that the appellants used a real firearm during the robberies. While the weapon was never fired, video evidence showed a gun being brandished at all of the robberies. That same video evidence showed that the weapon was repeatedly racked. And an unfired cartridge was found at one of the scenes, which matched a box of ammunition found in Onyewu's car. In the face of such overwhelming evidence, Agent Tahan's testimony regarding the photograph of the gun was a marginal piece of a much larger puzzle, and her testimony alone could not have reasonably impacted the jury's verdict. Accordingly, we hold that the district court's error in admitting Agent's Tahan's testimony as lay opinion testimony was harmless and we further reject Flumo's argument to vacate his conviction on these grounds.

#### ***4. Sufficiency of Evidence for Flumo's § 924(c) Convictions***

Finally, Flumo asserts that the district court erred in denying his motion for judgment of acquittal as to his 18 U.S.C. § 924(c) charge, arguing that "[t]he evidence presented [was] insufficient to support a § 924(c) conviction" under an aiding-and-abetting theory. Appellants' Br. 107. Reviewing the challenge to the sufficiency of the evidence de novo, and "asking whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt," we affirm the decision of the district court. *United States v. Brock*, 94 F.4th 39, 46 (D.C. Cir. 2024) (citation modified).

18 U.S.C § 924(c) prohibits using or carrying a firearm during a crime of violence. One can be guilty of violating § 924(c) under an aiding-and-abetting theory of liability. Flumo was charged under § 924(c) for aiding and abetting only the fifth and sixth robberies (out of a total of ten) at the El Don Restaurant and Sunoco Gas Station.

The Supreme Court set forth the standard for determining whether the Government has proven its § 924(c) case under such a theory in *Rosemond v. United States*, which held that the Government had to prove two things: that the "defendant actively participated in the underlying . . . violent crime" and that he did so "with advance knowledge that a confederate would use or carry a gun during the crime's commission." 572 U.S. 65, 67 (2014). We conclude that the Government met its burden and the evidence is clearly sufficient to uphold Flumo's charge.

Flumo claims that the Government has failed to prove that he "actively participated in the underlying" crime because it had not demonstrated that he "performed some act that directly facilitated or encouraged the use or carrying of a firearm." Appellants' Br. 108 (quoting *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994)). Flumo's contention is patently wrong under *Rosemond*, which held that the defendant "could assist in § 924(c)'s violation by facilitating *either* the [violent crime] or the firearm use [or both]." 572 U.S. at 74 (emphasis added). In other words, the Government is not required to prove that the defendant "performed some act that directly facilitated or encouraged the use or carrying of a firearm," *see* Appellants'

Br. 108, so long as it instead proved that the defendant assisted in facilitating the underlying violent crime more generally, *Rosemond*, 572 U.S. at 74–75 (noting that it is "inconsequential . . . that [the defendant's] acts did not advance each element of the offense; all that matters is that they facilitated one component."). Accordingly, here, the Government meets its burden under the affirmative act requirement if "any rational trier of fact could have found" that Flumo participated in the robbery. *Brock*, 94 F.4th at 46.

And indeed, here, any rational trier of fact could find that he participated, given the plethora of evidence presented to the jury demonstrating that Flumo participated in the robbery. As highlighted on *supra* Part II.E.3, cell site location data placed Flumo near the scene of multiple robberies, Flumo's arm tattoo was visible in the surveillance footage from the scenes of the crimes, and a jail call between Flumo and Sumo demonstrated that a certain jacket that one of the robbers was wearing during the course of multiple robberies belonged to Flumo. Further, some of the video evidence partly showed what appeared to be Flumo's face. Appellee Br. 14 (citing Prime Beer & Wine Co. Robbery [PBW002.mp4], Suppl. App. (Box, filed July 3, 2025) (on file with D.C. Circuit)). In light of this robust record, the Government clearly met the first prong of the *Rosemond* test.

Turning now to whether the Government proved that Flumo undertook the underlying offense "with advance knowledge that a confederate would use or carry a gun during the crime's commission," *Rosemond*, 572 U.S. at 67, we hold that it did. Under Supreme Court and D.C. Circuit precedent, to fulfill this intent requirement, the Government must show that the defendant had "advance knowledge" that a firearm would be used in furtherance of the underlying crime of violence, *see id.* at 79, and he must know to a "practical certainty that those . . . commit[ting] the crime of violence

would use a firearm in continuing that crime," *McGill*, 815 F.3d at 932–33 (citation modified).

Importantly here, Flumo was charged under § 924(c) for aiding and abetting only the fifth and sixth robberies, which were the fourth and fifth in which Flumo directly participated.[10] All the robberies preceding the El Don and Sunoco robberies involved the use of a gun. Those earlier robberies also happened in close succession, taking place either on the same day or only a few days apart.[11] Additionally, robberies one through four also had a consistent scheme, with at least two of the men entering the store while wearing ski masks, dark clothes, and gloves, one tasked with threatening employees and patrons inside the store with a weapon—always a gun—and the other tasked with gathering cash and valuables. Finally, as outlined above, there were numerous pieces of evidence connecting Flumo to those earlier robberies.

We have held that "evidence of the prevalence of guns in a particular context" can be used as a factor to allow the jury to infer that a certain defendant "knew to a practical certainty" that a firearm would be used in the underlying violent crime. *McGill*, 815 F.3d at 933 (quoting *United States v. Powell*, 929 F.2d 724, 729 (D.C. Cir. 1991)). Here, the record is replete with evidence of the "prevalence of [a] gun[]" in the scheme

[10] While Flumo's cell site data placed him near the scene of the first robbery, he did not appear in the video evidence.

[11] Indeed, the entirety of the ten robberies was completed within the month of January. The BP Gas Station was robbed on January 2, 2018, Lucky Seven on January 3, Lucky's Beer & Wine on January 10, Delicias Market II on January 10, El Don Restaurant on January 12, Sunoco Gas Station on January 17, Las Placitas Restaurant on January 22, Prime Beer & Wine on January 27, Sheger International Market on January 27, and Exxon Gas Station on January 29. J.A. 45–46.

that appellants created. Accordingly, a rational trier of fact could find that because Flumo participated in some way in robberies one through four—where appellants operated the same scheme with only days in between each of the crimes—in which a firearm had been utilized, then he had to have had "advance knowledge" "to a practical certainty" that a firearm would be used for the fifth and sixth robberies as well. *See also United States v. Harrington*, 108 F.3d 1460, 1471 (D.C. Cir. 1997) (holding that the defendant knew to a practical certainty that his partner would use a gun when the defendant previously knew nothing of the firearm, but still acted as the getaway driver after seeing said partner fire a gun at pursuing officers). Accordingly, we affirm the district court's denial of Flumo's motion for judgment of acquittal as to Flumo's § 924(c) charge.

**F. Ineffective Assistance of Counsel Claims**

There have been a number of ineffective assistance of counsel ("IAC") claims lodged in this case, one claim filed jointly by all appellants and then multiple others filed individually by Flumo. All of them fail under D.C. Circuit and Supreme Court precedent because the trial record is clear that none of the appellants can demonstrate prejudice.

When a defendant alleges that their counsel has been ineffective, they must successfully demonstrate: (1) that their counsel made errors that are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Given the "fact-intensive nature of the *Strickland* inquiry . . . this court's general practice is to remand the claim for an evidentiary hearing unless the trial record alone conclusively shows that

the defendant either is or is not entitled to relief." *United States v. Rashad*, 331 F.3d 908, 909 (D.C. Cir. 2003) (citation modified). Here, because the trial record conclusively shows that even if counsel were deficient in the ways appellants contend, appellants still cannot show a reasonable probability of a different outcome, we decline to remand the claims, and instead hold that all the IAC claims fail. We interrogate those claims below and explain our holding as to each.

***1. Joint IAC Claim***

We begin with appellants' joint IAC claim. This claim is premised on the police's search of Onyewu's vehicle. The police seized Onyewu's vehicle on February 8, 2018, but they did not execute the search warrant for the car until February 15. Appellants allege that the phone records from a phone within the vehicle demonstrate that the police accessed the car without a warrant in between February 8 and 15 because those phone records show outgoing activity between the aforementioned dates. Because appellants' counsel failed to file any motions to suppress the evidence found in Onyewu's car on the basis of those phone records, appellants allege that their attorneys were ineffective. Additionally, appellants' assert that counsels' failure to call any witnesses to interpret the phone records was likewise ineffective.

We find this joint IAC claim unavailing. Even assuming that appellants are correct—that the phone records did demonstrate that police accessed the car prior to the issuance of the search warrant *and* that their counsels were deficient in not moving to suppress the evidence found in the car based on those grounds or in admitting witnesses who could testify to those records—appellants' joint IAC claim still fails because there is no "colorable" argument for suppression, which means that there is no "colorable" argument for prejudice. *See United*

*States v. Sitzmann*, 893 F.3d 811, 831–32 (D.C. Cir. 2018); *see also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

Even if the police unlawfully searched the car, the independent source doctrine—which allows for the admission of unlawfully obtained evidence "if officers independently acquired it from a separate, independent source"—would still have rendered the subsequent search of the car lawful. *Utah v. Strieff*, 579 U.S. 232, 238 (2016). For the doctrine to apply, the police's decision to seek the warrant for the car must not have been prompted by what they had seen through the unlawful search of the phone and no information related to the allegedly illegal search of the phones can have been presented to the magistrate judge issuing the warrant. *Murray v. United States*, 487 U.S. 533, 542 (1988). Additionally, a finding that the police would have sought a warrant regardless of the illegal search bolsters the application of the independent source doctrine. *Id*. at 543.

All of these factors are met here. The police obtained a search warrant for Onyewu's car that did not say anything about any phone (other than a quick reference to "cellular phones" as one of the items to be seized). *See* J.A. 68. Because no information related to the phones was in the warrant, it is reasonable to assume—and appellants have put forward no argument suggesting otherwise—that the magistrate judge was not made aware of any information the police gleaned from the alleged illegal search of the phone (assuming it happened). Additionally, the record also supports a finding that the police would have sought a search warrant even without having performed the alleged unlawful search, as the police had already seized the car prior to the outgoing activity in the phone records. Because the independent source doctrine would have

rendered the alleged illegal search of Onyewu's car lawful, there can be no colorable argument of prejudice connected to counsels' failure to file motions to suppress premised on these grounds. Appellants' joint IAC claim is thus denied.

### *2. Flumo's Individual IAC Claims*

Flumo also raises a number of IAC claims against his attorney, alleging that his counsel was deficient because: (1) they failed to investigate the case; (2) they provided Flumo insufficient access to his discovery; and (3) they failed to challenge certain government testimony. We likewise do not find any of those claims to be colorable, again because the trial record "conclusively shows that the defendant" is not entitled to relief. *Rashad*, 331 F.3d at 910 (citation modified).

First, Flumo contends that his counsel was ineffective for failing to properly investigate his case. Flumo raises three points to demonstrate his counsel's deficiencies as to this specific IAC claim: (1) that Flumo had to file his own pro se motion to suppress evidence recovered from the Samsung Galaxy phone and a Rule 33 motion for a new trial based on newly discovered evidence; (2) that his counsel failed to investigate AT&T evidence that would have demonstrated that Flumo "never had an AT&T account in his name"; and (3) that his counsel failed to "introduce into evidence call detail record from the Samsung phone," the number of which was tied to "5566." Appellants' Br. 13, 111–13. Even assuming that Flumo's counsel was deficient for failing to do these things, there is again no "colorable" argument for prejudice.

On Flumo's contention that he had to file his own pro se motions, there is no "colorable" argument for prejudice because those motions were filed and considered by the district court. Flumo has not put forward any arguments—and the trial

record does not show—how the outcome of Flumo's case would have been different if counsel had made these motions rather than Flumo.

On Flumo's contention that his counsel failed to investigate AT&T evidence, there is no "colorable" argument for prejudice because AT&T had submitted a certified business record that tied a phone number ending in "8846" to Flumo. Although Flumo alleges that he had disclosed to the district court in an ex parte proceeding that his girlfriend had obtained exculpatory records showing that the number was never linked to Flumo, he never sought to present that information to the court or to his attorney. Flumo's argument of prejudice is thus conclusory, "fault[ing] his . . . attorney[] for not finding" the AT&T records, without providing any reason for believing that the records exist. *United States v. Tucker*, 12 F.4th 804, 817 (D.C. Cir. 2021). This claim can thus present no colorable argument for prejudice either.

Finally, on Flumo's contention that his counsel failed to investigate the "5566" number and call records associated with that number, Flumo again presents no colorable argument for prejudice. As noted above, AT&T had submitted a certified business record linking the "8846" number to Flumo. The cell site location data that placed Flumo near the location of several of the robberies was conducted using this number. However, the Samsung Galaxy phone discovered during the search of Onyewu's car was associated with a number ending in "5566." Flumo's theory of prejudice is that if his counsel had investigated the "5566" number, counsel would have found that the device associated with that phone was never in the vicinity of any of the robberies. But even if we take all inferences in favor of Flumo and accept that the records associated with the "5566" number would have shown that this phone was nowhere near the robberies during the time that they

occurred, there was still a certified business record from AT&T tying the "8846" number to Flumo, and that phone was linked to the robbery locations. In other words, even if Flumo's attorney had presented evidence that the "5566" phone was never in the vicinity of the robberies, there is no reasonable probability that such evidence would have changed the outcome, given the evidence that the "8846" phone *was* near the robbery locations and was associated with Flumo. Accordingly, we deny Flumo's IAC claim that his counsel was ineffective for failing to investigate the case.

Second, Flumo asserts that his counsel was ineffective because they did not provide Flumo with sufficient access to the discovery. It is clear, however, that Flumo's real contention is that he was not provided *timely* access to certain documents, including the warrant associated with the "8846" number and the AT&T call detail records for the same. Indeed, Flumo admits in his briefing that he viewed these records after trial began. Flumo alleges that the delay in receiving his discovery prejudiced him because it deprived him "of the opportunity to litigate issues, including moving for suppression." Appellants' Br. 116. But nowhere does Flumo allege that his *counsel* did not review the discovery that Flumo presumably saw very late into his trial or that his counsel was deficient for not utilizing that discovery in a motion to suppress. In fact, the trial record is clear that counsel saw both the warrant and the call detail records. Flumo has made no colorable argument as to what theory of suppression he would have asked his lawyer to pursue or why any such motion to suppress would likely have been successful. Consequently, we deny Flumo's second IAC claim.

Flumo's final assertion is that his counsel was ineffective for "failing to challenge and subsequently eliciting improper lay opinion testimony" from an officer named Detective Dyer.

Appellants' Br. 116. Detective Dyer had testified that the word "twelve," as used in a jail call between Flumo and Sumo, was slang for "police." J.A. 392. Flumo claims that his counsel should have objected to such testimony as improper lay testimony. Even assuming that his counsel was deficient for not objecting, Flumo has, yet again, failed to raise a colorable prejudice argument. Flumo states that "Detective Dyer's interpretation of the jail call" was prejudicial because it was referenced multiple times in the Government's closing. Appellants' Br. 117. But while the Government referenced the jail call between Flumo and Sumo on multiple occasions, none of those references relied upon Detective Dyer's interpretation of the word "twelve" as slang for "police." Indeed, this particular testimony had "minimal impact," *see United States v. Glover*, 872 F.3d 625, 635 (D.C. Cir. 2017), because what was important about the jail call was not whether Flumo was referring to police in his conversation with Sumo but instead that Flumo told Sumo to destroy a certain jacket. There is thus no "colorable" argument for prejudice. Along the same lines, Flumo also briefly raises that his counsel's performance was ineffective because they "elicited additional improper [lay] testimony on cross-examination," and that such performance was deficient and prejudicial. Appellants' Br. 17. Such conclusory assertions present no "colorable" arguments, especially as Flumo has identified no "specific statements" for this Court to analyze. *Sitzmann*, 893 F.3d at 832.

In sum, we decline to remand any of Flumo's ineffective assistance of counsel claims as none present a colorable argument of prejudice.[12]

---

[12] Flumo additionally raises a flurry of IAC claims near the end of appellants' brief, cursorily claiming that his counsel was deficient for failing to call Detective Lin as a witness in the motion to suppress hearing, not objecting to hearsay testimony during the suppression hearing, and not obtaining or introducing call records from the jail

## III. Conclusion

For the foregoing reasons, the rulings of the District Court are affirmed.

*So ordered.*

---

that would have allegedly "contradicted the government's interpretation" of a jail call introduced at trial. Appellants' Br. 117–18. As to prejudice, Flumo tersely states that the Government cannot meet its burden to "'conclusively demonstrate' that [Flumo] cannot show prejudice at an evidentiary hearing." *Id*. at 118 (quoting *Rashad*, 331 F.3d at 909, 912). Flumo has merely mentioned these arguments "in the most skeletal way," leaving the court to "put flesh on its bones"; accordingly, Flumo has forfeited these arguments. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019); *see also Tucker*, 12 F.4th at 816 (holding that when claims are presented in a "vague or conclusory manner," we deny those claims without remand).

WILKINS, J., *concurring*:

Judge Walker's concurring opinion questions the wisdom of our holding in *United States v. Burwell*, 122 F.4th 984, 986 (D.C. Cir. 2024) that, at common law, robbery could sometimes be accomplished by taking property without a threat of physical force, specifically by using a threat to accuse the victim of sodomy. *See* Walker Op. at 1–3. I write separately to respond to Judge Walker's doubts.

First, Judge Walker observes that our holding in *Burwell* is in tension with dictum in *Delligatti v. United States*, 604 U.S. 423, 430–33 (2025) that, in turn, quoted from *Stokeling v. United States*, 586 U.S. 73, 78–86 (2019). But *Stokeling* is inapposite, and therefore so too is *Delligatti*. In *Stokeling*, the Court addressed a Florida robbery conviction pursuant to a state statute that had been construed by Florida's highest court to "require[] 'resistance by the victim that is overcome by the physical force of the offender.'" *See Stokeling*, 586 U.S. at 86 (quoting *Robinson v. State*, 692 So. 2d 883, 886 (Fla. 1997)); *see also id*. at 76. Thus, the Court had no occasion to ascertain whether common law robbery required physical force—the case turned on the meaning of the Florida robbery statute. Moreover, the question before the Court in *Stokeling* was whether the particular quantum of physical force mandated by the Florida robbery statute met the standard of 18 U.S.C. § 924(e)(2). *See id*. at 75 ("This case requires us to decide whether a robbery offense that has as an element the use of force sufficient to overcome a victim's resistance necessitates the use of 'physical force' within the meaning of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(i)."). *Stokeling* had nothing to say about the question of whether all common law robberies require the use of such force. Finally, *Stokeling* was also a case construing Section 924(e), rather than Section 924(c), the applicable provision here. Perhaps for these reasons, none of the parties even cited *Stokeling* to us in any of the briefing in *Burwell*.

Judge Walker also suggests that perhaps common law robbery did require the use of physical force because *Rex v. Donnally*, an old English case dating to 1779, could be construed as supporting the proposition that an accusation of sodomy "carried an implied threat of personal violence — potentially including violence from those who encountered the publicly accused person." Walker Op. at 2 (citing *Rex v. Donnally*, 1 Leach 193, 194, 197–99, 168 Eng. Rep. 199, 200–02 (1779)). Lest there be any doubt, the same judges who decided *Donnally* clarified their holding later in a case called *Hickman*:

> [T]he true definition of Robbery is the stealing, or taking from the person, or in the presence of another, property of any amount, with such a degree of force or terror, as to induce the party unwillingly to part with his property; and *whether the terror arises from real or expected violence to the person, or from a sense of injury to the character, the law makes no kind of difference; for to most men the idea of losing their fame and reputation is equally, if not more terrific than the dread of personal injury*. The principal ingredient in robbery is a man's being forced to part with his property; and the Judges are unanimously of [the] opinion, [t]hat upon the principles of law, and the authority of former decisions, a threat to accuse a man of having committed the greatest of all crimes, is, as in the present case, a sufficient force to constitute the crime of robbery by putting in fear.

*Rex v. Hickman*, 1 Leach 278, 280, 2 East P. C. 728 (1784) (emphasis added). *See also, e.g.*, *Simmons v. State*, 25 So. 881, 882 (Fla. 1899) ("The rule is well settled that property obtained by trick or artifice, or by threats of illegal arrest or criminal prosecution, or insinuations against character, except they relate to sodomitical practices, is not taken by 'putting in fear,' within the common-law definition of robbery[.]"); *Long v. State*, 12 Ga. 293, 318–19 (1852) ("[T]hreats of a prosecution amount to that violence by construction, which constitutes the offence of robbery, only in one instance, and that is when the threat is to prosecute for an unnatural crime; and it will be *robbery*, whether the party is guilty or not. So abominable is the crime, and so destructive is even the accusation of it, of all social right and privilege, that the law considers that the accusation is a coercion which men cannot resist.") (emphasis in original); *Britt v. State*, 7 Humph. 45, 46–47 (Tenn. 1846) (describing why sodomy is the exception to the rule that taking by use of accusation of a crime does not constitute robbery: "The reasoning on which the single admitted exception is made to rest turns upon the over-whelming and withering character of the charge and its damning infamy, so well calculated to unman and subdue the will and alarm the fears of the falsely accused."); *Houston v. Commonwealth*, 12 S.E. 385, 387 (Va. 1890) ("The demonstrations or fear must be of a physical nature, with the single exception that, if one parts with his goods through fear of a threatened charge of sodomy, the taking is robbery."). We cited seven different treatises for the same proposition in *Burwell*, *see* 122 F.4th at 992–93, and I refer any other doubters to that opinion rather than belaboring the point further here.

WALKER, J., *concurring*:

Today, we join our sister circuits in holding that Hobbs Act robbery is a crime of violence. That holding does not rely on an analogy to common-law robbery. I mention this because, in an opinion holding that federal bank robbery is not a crime of violence, *United States v. Burwell* said that common-law robbery did not require force or violence. *See* 122 F.4th 984, 992–93 (D.C. Cir. 2024).

I have great respect for *Burwell*'s author. And so long as *Burwell* is a binding precedent, I will of course follow its holding when it controls. But for two reasons, when *Burwell*'s holding does not directly control the answer to an open legal question that depends on the historical understanding of common-law robbery, I will be reluctant to expand it.

First, *Burwell* said that "the government's premise that common law robbery 'embraced only threats of immediate bodily harm to the victim' is flat wrong." *Id.* at 992 (quoting Government Br. at 15). But *Burwell*'s statement may be in some tension with statements by the Supreme Court. *See, e.g.*, *Delligatti v. United States*, 604 U.S. 423, 431–32 (2025) ("[V]iolent force encompasses 'the "force" required for common-law robbery,' which is 'the quintessential [Armed Career Criminal Act]-predicate crime.' Common-law robbery requires only the force needed to overcome the victim's slightest physical resistance, even if it results in 'minimal pain or injury.'" (quoting *Stokeling v. United States*, 586 U.S. 73, 78, 80, 83–84 (2019))).

Second, *Burwell* said that extorting money through "accusations of sodomy or an infamous crime" was considered robbery at common law even though it included no threat of violence:

> As Blackstone explained, robbery is the "felonious and forcible taking from the person of another of goods or money to any value, by violence *or putting him in fear*." 4 William Blackstone, Commentaries *241 (emphasis added).
>
> And multiple treatises, including Blackstone's, make clear that the fear element of common law robbery could be induced by threats of something other than violence. As Blackstone explained, "extorting money or [any] other thing of value by means of a charge of sodomy may be robbery." *Id.* at *244 n.14; *see also* [other treatises].

*Burwell*, 122 F.4th at 992–93.[1] However, that analysis may be in some tension with authorities suggesting that the threat of that particular allegation carried an implied threat of personal violence — potentially including violence from those who encountered the publicly accused person. *See, e.g.*, *Rex v. Donnally*, 1 Leach 193, 194, 197–99, 168 Eng. Rep. 199, 200–02 (1779) (rejecting the argument that the conduct was merely

[1] This quote regarding "a charge of sodomy" appears in an annotation of Blackstone's *Commentaries* by Thomas Cooley, who called the charge a sole exception to the rule that common-law robbery requires at least a threat of violence: "That extorting money or other thing of value, by means of a charge of sodomy, may be robbery, see People v. McDaniels, 1 Park. Cr. R., 198. *But this is an exceptional case*, and *it is held not robbery to extort money by means of the charge of any other offense*, as for instance, forgery. Long v. State, 12 Geo., 293; Britt v. State, 7 Humph., 45. Obtaining money from a woman under a threat to accuse her husband of an indecent assault, was held not to be robbery, in Rex v. Edwards, 5 C. & P., 518; 1 Moo. & R., 257." 4 William Blackstone, Commentaries *244 (Thomas M. Cooley ed., 3d rev. ed. 1884) (emphases added); *cf.* 4 William Blackstone, Commentaries *244 (Edward Christian ed., 1818) (does not include the quote).

"a fraudulent extorting, and not a taking by violence"; noting that the jury found that the victim surrendered his money "under an apprehension that his life was in danger"; and reasoning that the threat to take him before a magistrate presented "a threat of personal violence," because he had "every thing to fear in being dragged through the streets as a culprit charged with an unnatural crime"); *cf.* Chen Yehudai, *Informational Blackmail: Survived by Technicality?*, 92 Marq. L. Rev. 779, 805 n.158 (2009) ("In *Donnally*, the victim testified that he thought that not complying with the defendant's demands would cost him his life.").